[No. C036703. Third Dist. Dec. 11, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH SALVATORE MICELI, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rules 976(b) and 976.1 of California Rules of Court, this opinion shall be published with the exception of parts I, V, VI, and VII of the DISCUSSION.

## COUNSEL

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, John A. O'Sullivan and Janine R. Busch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, Acting P. J.**—A jury convicted defendant Joseph Salvatore Miceli of assault with a semiautomatic firearm upon Matthew Linton on July 4, 1999 (count 2; Pen. Code, § 245, subd. (b) [all further undesignated section references are to the Penal Code]), assault with a firearm upon Linton on July 4, 1999 (count 3; § 245, subd. (a)(2)), drawing or exhibiting a firearm in the presence of Linton, Janice Kohrdt, and Victor Padgett on July 4, 1999 (counts 8-10; § 417, subd. (a)(2)), and failure to process a firearms transaction through a licensed firearms dealer or law enforcement agency (count 11; § 12072, subd. (d)). As to counts 2 and 3, the jury found defendant personally used the firearm. (§ 12022.5, subd. (a).) However, the jury acquitted defendant of assault by means of force likely to produce great bodily injury upon Brenda Miceli on July 2, 1999 (count 1; § 245, subd. (a)(1)), assault

with a deadly weapon (a van) and by means of force likely to produce great bodily injury upon Linton on July 4, 1999 (count 4; § 245, subd. (a)(1)), and making terrorist threats against Linton, Kohrdt, and Padgett on July 4, 1999 (counts 5-7; § 422).

Granted five years' probation (including one year in county jail), defendant contends: (1) His conviction on count 3 must be stricken because assault with a firearm is a lesser included offense of assault with a semiautomatic firearm (count 2). (2) The trial court erred prejudicially by refusing to instruct on the defense of necessity. (3) Defendant's conviction on count 2 must be reversed because there was insufficient evidence that his firearm was operable as a semiautomatic weapon. (4) The trial court erroneously failed to instruct the jury sua sponte on the lesser included offense of assault with a deadly weapon with respect to counts 2 and 3. (5) Defendant's convictions on counts 2 and 3 must be reversed because the jury instructions were reasonably likely to have misled the jury into believing that an assault with a firearm may be based on pointing an unloaded gun. (6) The jury instructions were also reasonably likely to have misled the jury on the defense burden of proving self-defense. (7) The trial court erred prejudicially by failing to instruct sua sponte, with respect to all theories of assault, that defendant's burden was merely to raise a reasonable doubt whether he acted in self-defense. (8) The trial court erred prejudicially by excluding the testimony of Rocklin Police Captain William Hertoghe. (9) The cumulative effect of the trial court's errors compels reversal of defendant's assault and brandishing convictions.

In the published portion of our opinion, we reject contentions (2), (3), and (4). Thus, we conclude the trial court properly refused to instruct on the defense of necessity; substantial evidence supports defendant's conviction for assault with a semiautomatic firearm; and the trial court properly declined to instruct on the lesser included offense of assault with a deadly weapon.

In an unpublished portion of the opinion, we consider defendant's other contentions of prejudicial error. We shall strike defendant's conviction on count 3, because it is a lesser included offense of the crime of which defendant was convicted in count 2. In all other respects, we find no prejudicial error and therefore we shall affirm the judgment.

FACTS

Given the divergent testimony on almost every detail, the main witnesses' credibility problems, and the split verdicts, we cannot be sure exactly what

version of events the jury credited. Thus, we shall not try to reconcile all discrepancies in the evidence. It is clear, however, that regardless of defendant's claimed motives or others' alleged misconduct, the jury found defendant acted without legal justification when he pistol-whipped Matthew Linton on Linton's property in front of his guests, Janice Kohrdt and Victor Padgett.

*Background*

In July 1999, defendant and Brenda Miceli lived on Westwood Drive in Rocklin with their two children.[1] Defendant owned a computer business; a Rocklin police sergeant was a partner at one time and many officers were customers. Defendant had no criminal record.

Though defendant and Brenda never married, she had taken his name and they had been together for over 10 years. However, they had also separated several times.

In 1996 Brenda began to use methamphetamine and came to the attention of law enforcement. She was subsequently found to suffer from bipolar disorder. Prescribed medications brought it under control.

After this episode, according to defendant, police officers he knew suggested he get training in police work. He took peace officer standards training (POST) courses and did ride-alongs. He had previously acquired a .45-caliber Glock semiautomatic handgun in a transaction that did not go through a licensed firearms dealer or law enforcement agency.

Matthew Linton lived on defendant's block. He and defendant were acquainted before July 4, 1999. According to Linton, their acquaintance was casual but untroubled. According to defendant, however, he rebuffed Linton after learning of Linton's bad character.[2] Defendant claimed he had often seen "low-life drug addict people" going to and from Linton's house, and once saw drug paraphernalia on the premises. He had talked to Rocklin Police Captain Hertoghe about the activities at Linton's house.

---

[1] To avoid any possible confusion and intending no disrespect, we shall refer to Brenda Miceli by her first name.

[2] At the time of trial, Linton faced criminal prosecution on three counts. He was charged with lewd and lascivious conduct with a minor and providing alcohol and illegal substances to two minors before July 4, 1999; he was also charged with raping Brenda after that date. At an Evidence Code section 402 hearing in limine, Linton invoked the Fifth Amendment to the United States Constitution when questioned about sexual relations with Brenda, use of illegal drugs, and lewd acts with children. Before Linton testified at trial, the trial court informed the jury that Linton had invoked the Fifth Amendment on these subjects on advice of counsel and instructed the jury not to consider this fact for any purpose. However, defense counsel was permitted to ask Linton whether he had been accused of the acts for which he faced prosecution (though not to tell the jury about the prosecution itself).

According to defendant, Brenda's condition worsened beginning in May 1999. He suspected she had reverted to methamphetamine and Linton was her supplier. (Brenda testified that defendant was right.[3] According to her, Linton would put envelopes containing drugs under the tires of defendant's truck in his driveway. Neighbors apparently saw Linton do so.)

Dr. Lowell Sparks, Jr., and his wife Suzanne, a nurse (friends of and witnesses for defendant), advised him the interaction of methamphetamine with Brenda's prescribed medications could endanger her. According to defendant, Dr. Sparks warned she could have a stroke or heart attack; however, Dr. Sparks recalled saying only that methamphetamine could aggravate her bipolar disorder.

Defendant testified that he called Captain Hertoghe about his fears for Brenda. Hertoghe suggested defendant contact Sergeant Eaton, the head of the Rocklin Police Department's drug enforcement program. Defendant left a message for Eaton, but never got a response.

*The events of July 2-3, 1999*

Brenda told the police that during a quarrel with defendant at home on July 2, he choked her or grabbed her arm hard enough to bruise it. (However, the first officer to interview her did not believe this charge and left it out of his report.) She also said defendant had physically abused her before.[4]

After the quarrel, Brenda ran out of the house. Linton was driving by in his truck. He picked her up and took her to a friend's house, then to a motel, and finally to his home. Brenda testified she ingested methamphetamine supplied by Linton up until the evening of July 4. Linton testified he did not know she was using illegal drugs at this time.

According to defendant, on July 3 his daughters told him that Brenda had asked them to keep her relationship with Linton, including his furnishing of drugs to her, secret from defendant. In disgust, he packed a suitcase with her clothes and put it out on the porch.

---

[3]Though Brenda was the alleged victim in count 1 and appeared as a prosecution witness, her testimony supported defendant's story and frequently contradicted her prior statements to the police. She made clear she wanted the jury to acquit defendant on all counts.

[4]At trial, Brenda testified that defendant grabbed her arm on July 2 only to fend off her assault on him. She could not recall telling the police that he had abused her before that date. However, she said that she had been acting irrationally due to methamphetamine, twice trying to jump out of a moving car, not sleeping, and exploding in rage at defendant. According to both Brenda and defendant, the July 2 quarrel erupted when she overheard him talking on the telephone to a woman she suspected of having an affair with him.

Shortly afterward, according to defendant and Brenda, she called his cell phone from the motel on a pay phone, asking him to bring her home; according to Brenda, Linton cut off the call before she could say where she was. Linton testified she was asleep when he went back to the motel on July 3 and he spent no time with her that day.

Defendant testified that he was visiting his friends Marcie and Nick when he got this call, but then returned home. He knocked on Linton's door, but no one answered. He did not report Brenda's situation to the police because he believed Nick had done so. He and his daughters went back to Marcie and Nick's house to spend the night.

*The events of July 4, 1999*

On the morning of July 4, Linton returned to his house. According to him, he was alone; according to Brenda, she was with him.

Defendant returned home twice that day to pick up supplies for an office holiday party. According to defendant and Marcie, who accompanied him, the second time he found the house broken into and property stolen. After loading his truck with valuables and nailing the garage door shut, he left again. He had already put his gun into the truck.

In the late afternoon or early evening, Linton's friends Victor Padgett and Janice Kohrdt dropped in on him. According to their testimony, they were briefly visiting the Sacramento area, where they had once lived, before heading home to Reno. They did not come to obtain or use drugs, and neither was under the influence of any drug during the visit. (However, Padgett admitted occasionally using methamphetamine.) They saw Brenda, whom they did not know, doing laundry in Linton's house; they were told she was not getting along with her husband. She soon left the room. (According to Linton, she had come over just a few minutes before and did not go inside.)

Brenda testified that after Padgett and Kohrdt arrived, they obtained methamphetamine from Linton. She saw them inject it before she went outside to smoke.

Sometime before 7:00 p.m., Linton, Padgett, and Kohrdt came out of the house and went to Linton's truck parked in the driveway so that he could give the others his business cards and they could write down their new address for him. Brenda was in the backyard, smoking.

According to defendant, after his second trip home he went to the office picnic with the children at Marcie and Nick's house. Around 7:00 p.m. he

went back to his house to get jackets for the girls. They called and asked if their mother had come home. Worried about Brenda and fearing she was in trouble, he told the girls he would look for her.

Defendant testified that when he looked across the street to Linton's house and saw Linton, Padgett, and Kohrdt outside, he thought "it looked like the Charles Manson family . . . over there." Padgett was "dressed like a—you know, spikes and black and looked like Charles Manson to me," while Kohrdt was a "rowdy biker looking [*sic*] . . . just the low class real, you know, just as soon stick you with the knife than pay the ten bucks she owes you kind of a person."

Remembering his POST lessons about having a weapon ready when going to a drug house, defendant stuck his semiautomatic under his shirt before crossing the street. He testified he did not load the gun, but carried a clip in his pocket: he did not want to risk harming anyone, knowing "there was kids in the park and everything," but he "needed to go over there and ask [Linton], hey, where's Brenda, is she alive, is she okay," without getting shot or knifed. (However, after his arrest he had told the police he put a loaded magazine in the gun, though he did not chamber a round.)

Linton, Kohrdt, and Padgett testified that as they stood beside Linton's truck, defendant came onto Linton's lawn displaying a gun. Marching up to Linton, defendant asked him where defendant's wife was.[5] Linton said he did not know. Defendant hit him in the face and in his bare chest with the gun. Defendant threatened to shoot him; when Kohrdt and Padgett tried to intervene, defendant threatened to shoot them, too. Linton lost his footing and fell; defendant kicked him several times. Defendant continued to talk as the incident went on. According to Padgett and Kohrdt, defendant said his wife was on medication and should not be drinking; defendant also complained that he should not have to be dealing with this at his age. Linton remembered defendant yelling out his age. The victims did not remember him mentioning drugs.

At some point, the victims began to wonder whether defendant's gun was loaded, as he had not fired it and they could not see a clip in it. Kohrdt tried to wrestle it away from defendant, and Padgett tried to grab defendant.

Several persons in a park across the street saw and heard the altercation. Julie Watts, pushing her toddlers in swings less than 20 yards from the

---

[5] Brenda testified that as she stood in the backyard, she heard defendant in the front yard and climbed over the fence into the neighbor's backyard, where she hid in terror. After the incident the police found her there, crying hysterically, "[H]e's going to kill me."

scene, heard voices that sounded scared; turning to look, she saw a woman screaming "don't kill him" as one man pummeled another with a gun. She heard the first man scream that he would kill the other because "you're giving my wife crank."

Adam Nutt and Cameron Billings, teenaged boys playing basketball in the park farther from the scene than Watts, saw a man holding a gun and menacing several other people; a woman was yelling at him to stop. Billings saw the man holding the gun make contact with the victim's face; the others were trying to run from the first man, and no one but him had a weapon. After watching for a short time, the boys ran to a nearby house to call 911.

Thomas Head and Cassandra Elliot, who lived near the park, saw the incident from a further distance. They heard a man yelling and saw him chase the others. Head saw a gun in the first man's hand and heard him say "I'll kill you, you son of a bitch." Nutt and Billings arrived at Head's door as he went inside and called 911.

Hearing that someone had called 911, defendant ran. Soon after, he drove by in a van, veered toward Linton's truck, where the victims were still standing, and pointed something (probably a gun) out the window at them. He then drove off.

Rocklin Police Officer Knox, responding to the 911 calls around 7:45 p.m., found Linton, who looked scraped and battered; he did not seem under the influence of methamphetamine.[6] Officer Knox then found Brenda hiding in the neighbor's backyard, also apparently not under the influence of any substance. She said she had been visiting Linton to get away from defendant, with whom she had quarreled; hearing a disturbance and defendant's demand to know where she was, she hid.

After defendant's arrest a few hours later, he first said he had not been home all day, then demanded an attorney before making any statement, then changed his mind and gave a statement without an attorney. He told Officer Knox he had been drinking during the day, but was not drunk. In the evening, his younger daughter told him she had walked in on Brenda and Linton "fooling around." Defendant was so enraged he grabbed his semiautomatic, with a full clip of ammunition in it, "for protection" against Linton,

---

[6]Kohrdt and Padgett had already left because Padgett had an outstanding warrant and did not want to talk to the police at that time. However, they returned to Linton's house around midnight. Soon after, they spoke to the police by telephone.

who was a "drug dealer," and walked over to Linton's house. (He did not mention concern for Brenda's welfare or information that Linton was giving her "packages" as a reason for going over to Linton's house.) He demanded to know where Brenda was and why Linton had broken into defendant's house. He said he had "kept [his] shit together and . . . didn't shoot him"; he also denied hitting him. After Officer Knox told him of Linton's injuries and the presence of eyewitnesses, defendant said: "[O]kay, maybe I stomped on him a little bit but that's it, I never hit him with the gun." He denied trying to hit anyone with his van.

According to Charles Boyd, a dissatisfied customer of defendant's business, defendant said on July 17, 1999, that he had not been able to order parts for Boyd's computer because he was in jail. He claimed he had confronted a "drug dealer" who was giving his wife drugs and sleeping with her; after using a gun to intimidate him, defendant knocked him to the ground.

At trial, defendant denied striking Linton or threatening any of the alleged victims. He claimed that after he stepped onto Linton's property, intending only to talk to him, someone said, "Here he comes." Kohrdt and Padgett charged him; Kohrdt had her hand in her purse as if reaching for something, and Padgett had his hand on his buck knife.[7] Defendant drew his (unloaded) gun and ordered them to "freeze." He then approached Linton, who lunged for the truck door, lost his footing, fell to the ground, and grabbed defendant's legs; defendant tried to kick him off. Once defendant had the situation under control, he asked Linton where Brenda was; Linton said she was at the Best Western in Roseville. Defendant then told Linton it was fine if he and Brenda wanted to be together, but he should not give her drugs because it could kill her. Having delivered his message, he got in his van and drove away.

DISCUSSION

I*

. . . . . . . . . . . . . . . . . . . . . .

---

[7]Linton testified he did not see Kohrdt carrying a purse or Padgett wearing a buck knife on his belt. Kohrdt did not remember having a purse. Padgett testified he had not worn a buck knife for years.

*See footnote, *ante*, page 256.

## II

■ Defendant contends the trial court erred prejudicially by refusing his request to instruct the jury with CALJIC No. 4.43 (defense of necessity).[8] Counsel argued below that defendant had to act as he did to stop Linton from imminently endangering Brenda's life by giving her methamphetamine. Defendant renews that argument on appeal. We conclude the trial court did not err because substantial evidence did not support defendant's claim of necessity.

■ A defendant is entitled to instruction on request on any defense for which substantial evidence exists. (*People v. Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1] [limited on unrelated grounds by statute as described in *In re Christian S.* (1994) 7 Cal.4th 768, 777-778 [30 Cal.Rptr.2d 33, 872 P.2d 574]].) However, the trial court need give a requested instruction concerning a defense only if there is substantial evidence to support the defense. (*In re Christian S., supra,* 7 Cal.4th at p. 783.) ■ A defendant raising the defense of necessity has the burden of proving that he violated the law "(1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency." (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035 [48 Cal.Rptr.2d 877].) ■ Defendant failed to show substantial evidence in support of the second and fifth elements; thus, he was not entitled to instruction on necessity.

First, defendant did not show he had no adequate alternative to breaking the law. The normal and appropriate response to a perceived criminal emergency is to call the police. Defendant failed to show that that response would not have sufficed here. (See *People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135 [64 Cal.Rptr.2d 654].)

---

[8]CALJIC No. 4.43 states: "A person is not guilty of a crime when [he] [she] engages in an act, otherwise criminal, through necessity. The defendant has the burden of proving by a preponderance of the evidence all of the facts necessary to establish the elements of this defense, namely:

"1. The act charged as criminal was done to prevent a significant and imminent evil, namely, [a threat of bodily injury to oneself or another person] [or] [____];

"2. There was no reasonable legal alternative to the commission of the act;

"3. The reasonably foreseeable harm likely to be caused by the act was not disproportionate to the harm avoided;

"4. The defendant entertained a good-faith belief that [his] [her] act was necessary to prevent the greater harm;

"5. That belief was objectively reasonable under all the circumstances; and

"6. The defendant did not substantially contribute to the creation of the emergency."

The failure to report an emergency to the proper authorities does not bar a necessity defense if the evidence shows "a history of futile complaints which makes any result from such complaints illusory." (*People v. Lovercamp* (1974) 43 Cal.App.3d 823, 831 [118 Cal.Rptr. 110, 69 A.L.R.3d 668].) But defendant did not make that showing. He claimed he had repeatedly reported to the police his concerns about Linton's drug dealing and Brenda's reversion to methamphetamine, without result. But he did not claim he had ever reported to the police that Brenda was missing, in Linton's company, and at risk of her life from methamphetamine supplied by him—the circumstances constituting the alleged emergency on July 4, 1999. The evidence did not show that that complaint, if made, would have been futile, or that defendant had reasonable grounds to think it would have been.

Second, even assuming defendant had a good faith belief in the necessity for his acts, he failed to show this belief was objectively reasonable. As a matter of public policy, self-help by lawbreaking and violence cannot be countenanced where the alleged danger is merely speculative and the lawbreaker has made no attempt to enlist law enforcement on his side. "[T]he defense of necessity is inappropriate where it would encourage rather than deter violence. Violence justified in the name of preempting some future, necessarily speculative threat to life is the greater, not the lesser evil." (*People v. McKinney* (1986) 187 Cal.App.3d 583, 587 [231 Cal.Rptr. 729].)[9]

Because substantial evidence did not support the defense of necessity, the trial court correctly refused the requested instruction. (See *In re Christian S., supra,* 7 Cal.4th at p. 783; *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1270 [62 Cal.Rptr.2d 345].)

III

Defendant contends insufficient evidence supports his conviction for assault with a semiautomatic firearm (count 3) because his firearm, not having been loaded with a clip, was not operable as a semiautomatic weapon. Defendant is mistaken for two reasons. First, substantial evidence showed defendant's firearm was loaded. Second, the offense of assault with a semiautomatic firearm does not require proof that the weapon was operable as a semiautomatic firearm (i.e., loaded); the crime may also be committed by using the weapon as a bludgeon, as defendant did.

"Any person who commits an assault upon the person of another with a semiautomatic firearm shall be punished by imprisonment in the state prison

---

[9]In defendant's reply brief he asserts that because his gun was unloaded, his acts had no potential to cause violence; therefore this public policy argument fails. As we explain in part III below, however, substantial evidence showed his gun was loaded. Furthermore, going onto another person's property and pistol-whipping him, even with an unloaded gun, is a violent act.

for three, six, or nine years." (§ 245, subd. (b).) "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) ■■■ Assault requires the willful commission of an act that by its nature will probably and directly result in injury to another (i.e., a battery), and with knowledge of the facts sufficient to establish that the act by its nature will probably and directly result in such injury. (*People v. Williams* (2001) 26 Cal.4th 779, 782 [111 Cal.Rptr.2d 114, 29 P.3d 197] (*Williams*).)

■■■ Defendant asserts it is not an assault merely to point an unloaded gun in a threatening manner at someone. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 11, fn. 3 [82 Cal.Rptr.2d 413, 971 P.2d 618] (*Rodriguez*) [dicta]; *People v. Fain* (1983) 34 Cal.3d 350, 357, fn. 6 [193 Cal.Rptr. 890, 667 P.2d 694] (*Fain*).) We need not decide the validity of this traditional rule, which *Rodriguez* declined to address. (*Rodriguez, supra,* 20 Cal.4th at p. 11, fn. 3; but see *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 542, fn. 10 [91 Cal.Rptr.2d 778] (*Lochtefeld*) [calling the rule an "anachronism" and urging Supreme Court to reexamine and discard it].) Even if this rule is still good law it does not help defendant, because he did more than merely point an unloaded weapon.

First, despite defendant's view, sufficient evidence existed that his gun was loaded. Officer Knox testified that after his arrest defendant told the police he put a loaded magazine in the gun, though he did not chamber a round. The fact that he denied making that statement and told a contrary story at trial did not render Officer Knox's evidence incredible or insubstantial; nor did Officer Knox's failure to record defendant's statement. Nor did others' equivocal testimony that they were unsure whether the gun was loaded or that they could not see a clip in the gun (which, even if correct, did not rule out the possibility that the gun had a loaded magazine in it). Officer Knox's testimony showed a prior inconsistent statement by defendant which the jury could consider for its truth. (Evid. Code, § 1235; *People v. Hawthorne* (1992) 4 Cal.4th 43, 55, fn. 4 [14 Cal.Rptr.2d 133, 841 P.2d 118], cert. den. 510 U.S. 1013 [114 S.Ct. 605, 126 L.Ed.2d 570], rehg. den. 510 U.S. 1159 [114 S.Ct. 1141, 127 L.Ed.2d 451]; see *People v. Chavez* (1980) 26 Cal.3d 334, 353-360 [161 Cal.Rptr. 762, 605 P.2d 401]; *People v. Brown* (1995) 35 Cal.App.4th 1585, 1596-1597 [42 Cal.Rptr.2d 155].) If the jury found it true, it was sufficient to prove defendant's gun was loaded. To point a loaded gun in a threatening manner at another (especially if accompanied by threats to shoot, as here) constitutes an assault, because one who does so has the present ability to inflict a violent injury on the other and the act by its nature will probably and directly result in such injury. (§ 240; *Williams, supra,* 26 Cal.4th at p. 782; *Lochtefeld, supra,* 77 Cal.App.4th at pp. 541-542; *People v. Mosqueda* (1970) 5 Cal.App.3d 540, 544-545 [85 Cal.Rptr. 346] (*Mosqueda*).)

Second, nothing in section 245, subdivision (b), or in any apposite case law, indicates that assault with a semiautomatic weapon requires proof the gun was operable as a semiautomatic at the time of the assault. A person may commit an assault under the statute by using the gun as a club or bludgeon, regardless of whether he could also have fired it in a semiautomatic manner at that moment. (See *Rodriguez, supra,* 20 Cal.4th at p. 11; *Fain, supra,* 34 Cal.3d at p. 357, fn. 6; *Lochtefeld, supra,* 77 Cal.App.4th at p. 539; *Mosqueda, supra,* 5 Cal.App.3d at p. 544.)

"A firearm does not cease to be a firearm when it is unloaded or inoperable." (*People v. Steele* (1991) 235 Cal.App.3d 788, 794 [286 Cal.Rptr. 887].) This applies to semiautomatic firearms as well as any other kind. When a clip is removed from a semiautomatic firearm, the firearm does not suddenly become a billy club, a stick, or a duck.

Furthermore, section 245, subdivision (b), does not say, "assault with a *loaded* semiautomatic firearm"—it says simply, "assault . . . with a semiautomatic firearm." By contrast, numerous provisions in the Penal Code plainly require that a firearm be loaded as an element of an offense or a prerequisite to a specific sentence. For example, section 12023, subdivision (a), provides: "Every person who carries a *loaded* firearm with the intent to commit a felony is guilty of armed criminal action." (Italics added.) Section 12031 defines "carrying a *loaded* firearm" as a felony or misdemeanor under specified conditions. (§ 12031, subd. (a)(1), (2), italics added.) And section 12035 defines "criminal storage of a firearm" as "keep[ing] any *loaded* firearm within any premises that are under [a person's] custody or control . . . [if] he or she knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or legal guardian and the child obtains access to the firearm and thereby causes" injury. (§ 12035, subd. (b)(1) [first degree, involving death or great bodily injury], (2) [second degree, involving injury other than great bodily injury], italics added.)

Thus the Legislature knows how to specify that a firearm must be loaded in order for a criminal statute to apply. It did not so specify in section 245, subdivision (b). Consequently, when defendant used his unloaded automatic firearm as a bludgeon, he committed the offense of assault with a semiautomatic firearm.

Citing only a comment on federal sentencing guidelines, defendant surmises the Legislature prescribed a harsher punishment for assault with a semiautomatic firearm (§ 245, subd. (b) [three, six, or nine years]) than for assault with a firearm per se (§ 245, subd. (a)(1) [two, three, or four years])

because firing a semiautomatic weapon poses a greater risk than firing a weapon which is not semiautomatic. Defendant concludes the Legislature therefore could not have intended section 245, subdivision (b), to apply where a semiautomatic firearm is used in some manner other than firing. We reject this speculation because section 245, subdivision (b), does not reveal this purported legislative intent on its face and defendant cites nothing to show the California Legislature had that intent. ■ Where a statute is plain on its face, we need not and may not indulge in judicial construction. (*Beverly v. Anderson* (1999) 76 Cal.App.4th 480, 485 [90 Cal.Rptr.2d 545].)

■ There was overwhelming evidence that defendant used his semiautomatic firearm as a club or bludgeon. Almost every percipient witness testified that he did so, and the jury clearly disbelieved his denial. Therefore he could properly have been convicted under section 245, subdivision (b), on that basis, as well as on the basis that his firearm was loaded.

Defendant contends he could not have been convicted of assault with a semiautomatic firearm for simply having pointed an unloaded firearm at others. Assuming this is true, it does not aid defendant's argument, which is that his conviction is not supported by substantial evidence. As we have recounted, abundant, reliable substantial evidence shows he pointed a loaded semiautomatic firearm at others and that he used a semiautomatic firearm to pistol-whip others. Both of these events supply substantial evidence that he had committed the offense of assault with a semiautomatic firearm.

## IV

■ Defendant contends his convictions on counts 2 and 3 must be reversed because the trial court failed to instruct the jury sua sponte as to those counts on the lesser included offense of "assault with a deadly weapon."[10] (§ 245, subd. (a)(1).) As to assault with a firearm (count 3), the contention is moot because we shall ultimately strike that conviction. As to assault with a semiautomatic firearm (count 2), we disagree with defendant.

■ A defendant is entitled to instruction on lesser included offenses, without a request or even over objection, if the evidence raises a question as

---

[10]The trial court instructed on that offense as to counts 1 and 4, on which it was the charged offense, but not as to counts 2 and 3.

Strictly speaking, the offense defined by section 245, subdivision (a)(1) is not assault "with a deadly weapon" but assault "with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury." However, defendant's argument does not address the remainder of the statutory language.

to whether all of the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) A lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater offense cannot be committed without committing the lesser. (*Id.* at p. 154, fn. 5.)

 Defendant asserts that assault with a deadly weapon is a lesser included offense of assault with a semiautomatic firearm because the latter offense cannot be committed without committing the former. (See *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 [68 Cal.Rptr.2d 655, 945 P.2d 1204] (*Aguilar*) ["deadly weapon" under § 245, subd. (a)(1), is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce death or great bodily injury"; *People v. Graham* (1969) 71 Cal.2d 303, 327 [78 Cal.Rptr. 217, 455 P.2d 153], disapproved on other grounds in *People v. Ray* (1975) 14 Cal.3d 20, 32 [120 Cal.Rptr. 377, 533 P.2d 1017] [gun is inherently "deadly weapon" under § 245, subd. (a)(1)].) Furthermore, the punishment for assault with a deadly weapon (a wobbler with a maximum felony sentence of four years) is less than that for assault with a semiautomatic firearm (a felony with a range of three, six, or nine years). Although defendant does not cite authority directly on point, we shall therefore assume for purposes of discussion that he is correct, and assault with a deadly weapon is a lesser included offense of assault with a semiautomatic firearm.

The trial court instructed on assault (§ 240) as a lesser included offense of assault with a semiautomatic firearm and assault with a firearm. However, the court did not instruct on assault with a deadly weapon as a lesser included offense of those crimes. We conclude the court did not err by failing to give this instruction because the jury could not have found defendant committed assault with a deadly weapon rather than assault with a semiautomatic firearm.

As we explained in part III, *ante,* a person may commit assault with a semiautomatic firearm by using it as a club or bludgeon, regardless of whether it is presently loaded or operable as a semiautomatic. (Therefore we reject defendant's contention that assault with a semiautomatic firearm must be supported by evidence that the firearm contained at least one bullet.) It was not disputed that defendant's Glock firearm was a semiautomatic. If the jury found that defendant committed assault as to count 2, it necessarily

found he did so with a semiautomatic firearm, whether by pointing a loaded firearm at the victim or by bludgeoning him with it.[11] Thus, assuming assault with a deadly weapon is a lesser included offense of assault with a semiautomatic weapon, the jury could not have found that defendant committed only the lesser offense.

Defendant relies on *Fain, supra,* 34 Cal.3d 350, which held that the jury could have properly convicted the defendant of assault with a deadly weapon even if it believed his testimony that his gun was unloaded, based on the evidence that he used the gun as a club or bludgeon.[12] (*Fain,* at pp. 353, 356-357 and fn. 6.) But *Fain* did not consider the questions presented here: whether assault with a deadly weapon is a lesser included offense of assault with a semiautomatic firearm, and whether, if so, a jury could find that a defendant who used an unloaded semiautomatic firearm to bludgeon his victim had committed only the lesser offense. Needless to say, in *Fain* the defendant did not contend he should have been convicted of the greater offense of assault with a firearm. Thus *Fain* is inapposite. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] ["Language used in any opinion is . . . to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citations.]"].)

Because there was no evidence that defendant's offense on count 2 was less than that charged, the trial court did not err by failing to instruct on assault with a deadly weapon as to that count. (*People v. Breverman, supra,* 19 Cal.4th at p. 154.)

## V-VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[11]Defendant does not contend the jury could have convicted him of assault with a deadly weapon based on the evidence that he kicked Linton, and such a contention could not succeed. (*Aguilar, supra,* 16 Cal.4th at pp. 1029-1034 [hands and feet not "deadly weapons" within § 245, subd. (a)(1)].)

[12]In *Fain,* where the defendant was charged with robbery plus firearm use enhancements, the trial court instructed the jury at both parties' request that assault with a deadly weapon was a lesser included offense within the accusatory pleading. (*Fain, supra,* 34 Cal.3d at p. 353.) The court noted that after the trial in this case it decided assault with a deadly weapon is not a lesser included offense to robbery with a firearm use enhancement. (*Id.* at p. 353, fn. 1.)

*See footnote, *ante,* page 256.

## VIII

Finally, defendant contends the cumulative effect of the trial court's errors compels reversal of his assault and brandishing convictions. As we have found only two instances of error, and that error was harmless, we reject defendant's contention.

## DISPOSITION

Defendant's conviction and sentence on count 3 are stricken. The trial court shall prepare an amended abstract of judgment showing the same and shall forward a certified copy to the Department of Corrections. In all other respects, the judgment is affirmed.

Nicholson, J., and Robie, J., concurred.

A petition for a rehearing was denied January 7, 2003, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 5, 2003.