Filed 8/20/14  P. v. Vera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TONY PEREZ VERA, <br><br> Defendant and Appellant. | F066398 <br><br> (Super. Ct. No. F12905691) <br><br><br> **OPINION** |

-ooOoo-

### THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Leanne Le Mon and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Poochigian, Acting P.J., Detjen, J. and Franson, J.

A jury convicted appellant, Tony Perez Vera, of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1))[1] and carrying a loaded firearm (§ 25850, subd. (a)). On appeal, Vera contends: (1) the court erred in admitting a prior conviction for impeachment purposes; and (2) the court committed instructional error. We affirm.

## FACTS

### *The Prosecution Case*

The prosecution evidence established that on July 30, 2012, Vincent Graves was working as a security guard for American A Plus Security. At approximately 8:15 p.m., Graves was on patrol at the San Ramon apartment complex in Fresno when he saw Jaime Reynaga, who was heavily intoxicated, facing and leaning against a wall. Graves approached Reynaga from Reynaga's left side and asked if he was alright. When Reynaga "came off the wall" and turned towards him, Graves noticed Reynaga was holding a revolver in his right hand by the handle, pointing down. At that moment, Vera came through a door that leads to a parking garage, stepped between the men with his back towards Graves, and stated, "No, man, it is just a toy."[2] Vera then took Reynaga through a gate and both men left.[3] Meanwhile, Graves called 911 and gave a description of both men.[4]

Fresno Police Officer James Young heard a dispatch about a man with a gun and responded to the area. As Officer Young travelled north on Sixth Street, he saw Vera and

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    It appeared to Graves that Vera was attempting to diffuse the situation.

[3]    Vera testified that Graves approached Reynaga with a gun drawn (see *post*). The parties, however, agreed not to ask Graves any questions regarding whether he possessed a gun because there was an issue regarding Graves's right to lawfully possess a firearm.

[4]    Four buildings made up the apartment complex. During cross-examination, when asked whether anyone was outdoors during his encounter with Reynaga and Vera, Graves testified that he had encountered some residents on the other side of the first apartment building. However, after Reynaga and Vera left, he walked through the complex and did not see anyone on the other side.

Reynaga walking south on Sixth Street towards Shaw Avenue, several blocks south of the apartment complex. After passing them and making a U-turn, Young contacted Vera and Reynaga with his gun drawn and ordered them to get on the ground. The men became argumentative and told Officer Young that they had not done anything wrong and for Young to "get the [expletive] out of [there]." Eventually, however, both men sat down on the ground, although they continued to be argumentative and yell at the officer. Officer Young continued to tell the men to lay on the ground and when they finally complied, other officers arrived and helped handcuff both men.

A search of Reynaga did not uncover a gun. However, Officer Danny Kim searched Vera and found a Ruger revolver protruding from his waistband in front of his stomach.[5] He then placed Vera under arrest for possessing the handgun. Vera had a strong odor of alcohol and his eyes were watery and bloodshot.

Graves was brought to the scene and identified Vera and Reynaga as the two men he encountered earlier at the apartment complex.

### The Defense Case

On July 30, 2012, at approximately 7:30 p.m., Vera took a bus to Reynaga's apartment and found him outside of the apartment with two other people, heavily intoxicated. Reynaga told Vera to wait and walked away. After hearing yelling that appeared to be coming from the parking lot, Vera went to investigate and saw Reynaga with a gun with his finger on the trigger, leaning against a wall, and a security guard (Graves) pointing a gun at Reynaga. In an attempt to calm things down, Vera got in the middle of both men. Vera told Graves that the gun was just a toy, and he put his arm around Reynaga and walked away with him in order to extricate Reynaga from a confrontation that involved two guns. Vera led Reynaga south on Sixth Street intending to take Reynaga to Vera's house. On the way, Vera was able to convince Reynaga to

---

[5]    The gun had three live rounds and did not have a safety.

give him the gun and Vera placed it in his waistband. At that point, Vera continued walking with Reynaga, but no longer assisted him. He then saw a patrol car pass them and make a U-turn, but he did not attempt to flag down the patrol car. After the patrol car stopped, an officer exited the car and approached Vera and Reynaga with his gun drawn and pointed at them. Vera admitted that he and Reynaga yelled at the officer and that he repeatedly yelled that he had not done anything wrong. However, he denied telling any of the officers to get the "[expletive]" out of there. Vera did not tell the officer he had a gun on him because he knew the officer was going to see the gun anyway and Vera did not want him or anyone else to get shot.

Vera also testified that in June 2010, when he was 18 years old, he was convicted of felony possession of brass knuckles.

### DISCUSSION

*Impeachment with the Prior Conviction*

Prior to the taking of testimony, the prosecutor moved in limine for the court to allow him to impeach Vera with his prior conviction for possession of a deadly weapon, i.e., brass knuckles. The court granted the motion over Vera's objection. Vera contends the court erred in granting the prosecutor's motion because possession of brass knuckles does not involve violence, menace, or threats and, thus, is not a crime of moral turpitude. We disagree.

> "Subject to the trial court's discretion under Evidence Code section 352, California Constitution, article I, section 28, subdivision (f), 'authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty. On the other hand, subdivision (d), as well as due process, forbids the use of convictions of felonies which do not necessarily involve moral turpitude.' [Citation.] Thus a 'prior conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude.' [Citation.] Crimes involve moral turpitude when they reveal dishonesty, a '"general readiness to do evil,"' '"bad character,"' or 'moral depravity.' [Citation.] Such crimes involve an act of baseness, vileness, or depravity in the private and social duties which a person owes to others or to society in general, contrary to the accepted and customary

4

rule of right and duty between people." (*People v. Gabriel* (2012) 206 Cal.App.4th 450, 456 (*Gabriel*).)

"In [*People v.*] *Garrett* [(1987) 195 Cal.App.3d 795], the court held that the possession of an unregistered firearm was a crime of moral turpitude; the defendant had been convicted of a federal crime outlawing the possession of unregistered weapons of a nature similar to the weapons enumerated in section 12020,[6] which 'outlaws a class of instruments normally used only for criminal purposes. [Citation.]' [Citation.] *The mere possession of such weapons indicates a readiness to do evil.*" (*Gabriel, supra,* 206 Cal.App.4th at p. 457, italics added.)

In *Gabriel,* the court held that the defendant's possession of an assault firearm was a crime of moral turpitude. (*Gabriel, supra,* 206 Cal.App.4th at p. 458.) In so holding, the court stated, "Just as possession of an unregistered firearm is a crime of moral turpitude because such weapons are normally used for criminal purposes, assault firearms are also typically used to commit crimes, and as the Legislature has outlined, cause greater harm to the public than general firearms, and thus possession of same should be considered a crime of moral turpitude." (*Ibid.*)

Here, Vera possessed brass knuckles, a weapon also included in the class of weapons enumerated in former section 12020 that are normally used only for criminal purposes. Thus, as in *People v. Garrett, supra,* 195 Cal.App.3d 795 (*Garrett*) and *Gabriel*, mere possession of brass knuckles is a crime of moral turpitude because it evinces a willingness to do evil.

Vera contends possession of brass knuckles is not a crime of moral turpitude because they are far less dangerous than the firearms involved in *Gabriel* or *Garrett* and they can be used for noncriminal purposes such as tenderizing beef or as novelties for displaying. However, in each of those cases, the salient reason for the court's ruling was that the firearm involved in each case was typically used for criminal purposes and not the degree of danger inherent in possessing each weapon. Further, although undoubtedly

---

**6** Section 12020, subdivision (a) (former section 12020), repealed by Stats. 2010, chapter 711, section 4, operative January 1, 2012, and reenacted as section 16920.

many illegal weapons can be used for noncriminal purposes and certainly most, if not all, can be displayed as novelties, this does not preclude the use of convictions for possessing these weapons for impeachment purposes. As noted by the court in *People v. Thomas* (1988) 206 Cal. App.3d 689, "to preclude the use of a prior conviction for the purpose of impeachment if there is any conceivable set of facts under which the offense could have been committed free of moral blame would mean that no prior conviction could ever be used for impeachment." (*Id*. at p. 698.) Thus, we conclude that the court did not err when it allowed the prosecutor to impeach Vera with his prior conviction for possessing brass knuckles.

### The Alleged Instructional Error

During the trial, the court denied defense counsel's request to charge the jury on the defense of necessity as embodied in CALCRIM No. 3403.[7] Vera contends the court erred in doing so because there was substantial evidence that supported charging the jury with this instruction. We disagree.

In a criminal trial, the court must give an instruction requested by a party if the instruction correctly states the law and relates to a material question upon which there is evidence substantial enough to merit consideration. (*People v. Avena* (1996) 13 Cal.4th

---

**7**    CALCRIM 3403 provides: "The defendant is not guilty of *<insert crime[s]>* if (he/she) acted because of legal necessity. [¶] In order to establish this defense, the defendant must prove that: [¶] 1. (He/She) acted in an emergency to prevent a significant bodily harm or evil to (himself/herself/ [or] someone else); [¶] 2. (He/She) had no adequate legal alternative; [¶] 3. The defendant's acts did not create a greater danger than the one avoided; [¶] 4. When the defendant acted, (he/she) actually believed that the act was necessary to prevent the threatened harm or evil; [¶] 5. A reasonable person would also have believed that the act was necessary under the circumstances; [¶] AND [¶] 6. The defendant did not substantially contribute to the emergency. [¶] The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the defendant must prove that it is more likely than not that each of the six listed items is true.

394, 424.) A trial court is not required to instruct on theories that lack substantial evidentiary support. (*People v. Miceli* (2002) 104 Cal.App.4th 256, 267.) The defendant has the burden of proving the defense of necessity by a preponderance of the evidence. (*People v. Heath* (1989) 207 Cal.App.3d 892, 901 (*Heath*).)

In order to "justify an instruction on the defense of necessity, there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency." (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.) "Necessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime." (*Heath*, *supra*, 207 Cal.App.3d at p. 901.)

The defense of necessity, in contrast to the defense of duress, has traditionally covered situations where physical forces beyond the defendant's control rendered illegal conduct the lesser of two evils. (*Heath*, *supra*, 207 Cal.App.3d at p. 899.) "The defense of necessity generally recognizes that '"the harm or evil sought to be avoided by [the defendant's] conduct is greater than that sought to be prevented by the law defining the offense charged."'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 100 (*Coffman and Marlow*), brackets in original.)

The necessity defense is available to a defendant if the actions he or she intended to engage in, and did engage in, were unlawful. (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 100.) The situation presented to the defendant must be of an emergency nature, threatening physical harm, and lacking an alternative legal course of action. (*People v. Weber* (1984) 162 Cal.App.3d Supp. 1, 5.) The standard of prejudice for failure to instruct on an affirmative defense has not yet been defined. (*People v. Salas* (2006) 37 Cal.4th 967, 984.)

Vera focuses his arguments on the alleged necessity for him to intervene when Graves confronted Reynaga at the apartment complex. The undisputed facts, however, showed that the unlawful possession of the gun by Vera occurred when he took possession of the gun from Reynaga as they walked down Sixth Street toward Shaw Avenue. However, there was no evidence that as Reynaga walked with Vera he acted in an aggressive or threatening manner or that he might use the gun against anyone, including Vera. Thus, there was no evidence of an emergency at that time that made it necessary for Vera to take possession of the gun from Reynaga.

Further, Vera had the opportunity to tell Officer Young that he had a gun and to give it to him when the officer first ordered him and Reynaga to get on the ground. Consequently, at that point any "necessity" for Vera to possess the firearm in order to "safely" dispose of it dissipated and Vera's continued possession of the revolver, until another officer took the gun from Vera's waistband, was unlawful. (Cf. CALJIC No. 12.50 ["A person previously convicted of a felony does not violate [section] 12021 ... by being in possession of a firearm if: [¶] … [¶] ... possession of such firearm was temporary and *for a period no longer than that in which the necessity or apparent necessity to use it in self-defense continued*; ..." italics added].) In either case, there was no factual basis for the court to charge the jury with the defense of necessity with respect to either of the two charges Vera was convicted of.

In any event, even if the court erred in failing to charge the jury with the necessity defense, the error was harmless beyond a reasonable doubt for several reasons. First, as noted above, there was no emergency when Vera took the gun from Reynaga.

Second, by removing Reynaga from the scene and not allowing Graves to detain and disarm him, Vera needlessly and recklessly created the "necessity" that resulted in him taking possession of the gun from Reynaga. Graves was performing his duties as a security guard when he encountered an armed and inebriated Reynaga. Further, Graves had the advantage over Reynaga because while Graves had his gun pointing at him,

8

Reynaga only held his gun by the handle, at his side, pointing down. At that point, Reynaga would have been forced to turn over the gun or face the prospect of serious injury. In either case, the danger to innocent parties was nonexistent or minimal because there were no bystanders in the immediate vicinity at the time. In contrast, Vera's intervention took the advantage away from Graves and could have resulted in serious injury to any of the three men by triggering a fire fight. Thus, there was no need for Vera to remove Reynaga from the scene, and his unjustified conduct in doing so created the "necessity" that he claims permitted him to take possession of Reynaga's revolver.

Third, Vera's conduct belies the notion that in taking the gun away from Reynaga, he was motivated by a good faith belief that it was necessary to do so. When Vera managed to convince Reynaga to give him the gun, he made no effort to turn it over to law enforcement, to Graves, or some other responsible adult. Even though he saw Officer Young's patrol car approaching him and Reynaga, he made no attempt to flag down the officer. Further, when first confronted by Young, instead of informing him he had a firearm, which he knew he was not entitled to possess because of his status as a felon, he joined Reynaga in repeatedly yelling at the officer that they had done nothing wrong and telling him to get the "[expletive]" out of there.

Moreover, Vera's entire conduct in this matter strongly suggests that his motive for whisking Reynaga away from the confrontation with Graves was simply to help a friend by keeping him from being arrested. Given these circumstances, it was extremely unlikely that the jury would not have found Vera guilty of the two charges he was convicted of, even if the court had charged the jury on necessity as a defense. Thus, we conclude that any error in the court's failure to charge the jury on necessity as a defense was harmless beyond a reasonable doubt.

**DISPOSITION**

The judgment is affirmed.

9