Filed 3/17/15  P. v. Peeler CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>BRICE PEELER,<br><br>      Defendant and Appellant. | C076528<br><br>(Super. Ct. No. 12F06302) |

A jury found defendant Brice Peeler guilty of assault with a semiautomatic firearm on a peace officer, felony evading a peace officer, and possession of a firearm by a convicted felon, and found he personally used a firearm during the assault.  (Pen. Code, §§ 245, subd. (d)(2), 12022.53, subd. (b), 29800, subd. (a)(1); Veh. Code, § 2800.2, subd. (a).)  The trial court found defendant had a prior serious felony conviction, a strike, and had served three prison terms.  (Pen. Code, §§ 667, subds. (a), (b)-(i), 667.5, subd. (b),

1170.12.)  The trial court sentenced him to prison for 38 years eight months.  Defendant timely appealed.

On appeal, defendant (1) seeks review of the materials examined in camera during his *Pitchess* hearing (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531), (2) contends no substantial evidence shows the pistol he used was operable, and (3) contends trial counsel was ineffective because she conceded liability on one count and failed promptly to move to strike an officer's "gratuitous" testimony.  Disagreeing, we shall affirm.

## FACTS

Sacramento County Sheriff's Detective Kevin Reali testified he received a call from Nevada County Sheriff's Detective Bingham on September 14, 2012, asking for help in serving a felony warrant on defendant.  Bingham told him defendant might be armed with a handgun.  Five days later, Bingham called again and asked Reali to check a house in the Antelope area of Sacramento.  Reali saw a man leave the house, put something in the trunk of a Volvo, and get in the driver's seat.  After a woman entered the Volvo, the Volvo left, and Reali tried to reach Bingham, without success.  Reali reached Detective Jeff Martin, who asked him to check on a white panel van at a Walmart, because defendant was thought to use it to hide things.  Martin testified he told Reali that multiple informants had recently seen defendant with "a handgun and/or a small assault style rifle" and that he always carried those weapons with him.  Reali saw the van, called back-up, and when other officers arrived, Reali returned to the Antelope house.

Reali learned a team comprised of Nevada and Placer County officers had found the Volvo in Orangevale, and went to discuss with those officers how to apprehend defendant safely, given that they understood he might be armed, and there were two females in the Volvo, which was in motion.  Reali entered Sergeant Gregory Coauette's unmarked Ford Expedition, "and we were maybe fifth or sixth . . . in the conga line, as you might say, into following the Volvo away . . . ."

2

The Volvo turned into a parking lot and most of the "conga line" followed, but Reali and Coauette remained on Greenback Lane, so that when the Volvo unexpectedly left the parking lot, they were directly behind defendant in the Ford. Coauette thought the line of unmarked cars behind them was perhaps eight or nine vehicles long. The Volvo's occupants looked back at the cars following them, and accelerated suddenly. The officers activated the Ford's lights and siren and pursued defendant, who attempted to elude the officers at high speed, running stop signs. When he stopped the Volvo, defendant fled on foot. Reali saw defendant held a handgun; Coauette ducked because defendant pointed his gun over his shoulder, towards the officers, as he ran in front of their car. By the time Reali was able to get out of the car, defendant had reached a lawn and jumped over a fence. To Reali, defendant seemed to aim more towards Coauette. Coauette saw the gun "pointed straight in the window at me." "That handgun stayed on target [i.e., pointed at Coauette] for quite a while." Reali had feared he and Coauette would be shot. Although Reali planned to shoot defendant due to the risk he presented to the public and to the officers, by the time he got out of the car, defendant had made it to the fence.

A pistol was found in a tomato garden of a residential yard not far from where defendant was captured, after he repeatedly defied orders to stop. The chamber was clear, as shown by moving the slide back, but the magazine was loaded. According to the testimony, "All you had to do was pull back on the slide and it would load the next cartridge [in the magazine]." The pistol, magazine, and cartridges from the magazine, were introduced into evidence and shown to the jury. The gun was not fired, nor was an effort made to chamber a round to see if it would jam.

A binder was found in the Volvo which contained pages listing different law enforcement radio frequencies.

The parties stipulated defendant was a convicted felon.

## DISCUSSION

### I

### Pitchess *Motion*

Defendant asks that we review the peace officer personnel file materials produced in response to his *Pitchess* motion, to determine if the trial court (Chang, J.) abused its discretion in not disclosing such materials to the defense, and the People do not oppose defendant's request. We have reviewed the *Pitchess* record and find no procedural or substantive error in the trial court's handling of the motion. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1208-1209.) No relevant personnel materials exist. Thus, there was nothing to disclose.

### II

### *Substantial Evidence Claim*

Defendant contends there was no evidence the pistol was operable, therefore no substantial evidence supports his assault conviction because he lacked the "present ability" to inflict injury. Although there was no *direct* evidence the gun was operable, the pistol's operability was shown by circumstantial evidence.

The trial court granted the People's request for what was described as a "pinpoint" instruction on assault with a firearm, as follows:

> "Assault with a firearm does not require that the defendant actually shoot the firearm or try to shoot the firearm. The test is whether the defendant demonstrated the present ability to complete the attack. The present ability element . . . is satisfied when a defendant has attained the means and location to strike immediately, meaning that the defendant must have the ability to inflict injury on the present occasion although the defendant need not have the ability to inflict injury instantaneously."

This instruction was based on *People v. Chance* (2008) 44 Cal.4th 1164. It emphasizes the "present ability" element, which--as defendant maintains--includes the fact that a gun must be operable.

4

The prosecutor in this case argued: "This gun was ready to go. Rack a round in and you're good." During closing argument, defense counsel conceded the gun was a "a semiautomatic handgun," but argued no fingerprints or DNA were found on it or the magazine, and suggested the officers were mistaken or lying about the gun, because of testimonial discrepancies.

Based on the circumstances, namely, defendant's flight with the gun, his act of pointing it at peace officers, the fact the magazine was loaded, and the fact that he discarded it while fleeing, the evidence supports the jury's implicit finding that he had the "present ability" to cause harm by firing the gun. This is in accord with the many cases holding that it may be inferred a gun is real and is loaded from a defendant's conduct with that gun. (See, e.g., *People v. Rodriguez* (1999) 20 Cal.4th 1, 10-13, see *id.* at p. 12 ["California courts have often held that a defendant's statements and behavior while making an armed threat against a victim may warrant a jury's finding the weapon was loaded"]; *People v. Monjares* (2008) 164 Cal.App.4th 1432, 1435-1438 [reasonable to infer gun displayed during robbery was not a toy]; *People v. Miceli* (2002) 104 Cal.App.4th 256, 268-269.)

As we observed 40 years ago: "[P]ointing an unloaded gun at another person with no effort or threat to use it as a bludgeon, is not an assault with a deadly weapon." (*People v. Orr* (1974) 43 Cal.App.3d 666, 672.) However, as we held long before that, whether a gun is operable may be inferred from all of the circumstances, and need not be shown by direct evidence. (See *People v. Simpson* (1933) 134 Cal.App. 646, 651-652.) In *Simpson*, the trial court granted a new trial, believing that the fact a cartridge had not been chambered in a repeating rifle with a loaded magazine meant there was no "present ability" to cause harm, a proposition with which we pointedly disagreed: "It is unreasonable to hold that a rifle is unloaded and that it is not susceptible of immediate discharge under such circumstances. One may just as reasonably assert that a pistol with an automatic revolving cylinder filled with loaded cartridges does not constitute a deadly

5

weapon, although the mere pressure of a finger upon the trigger releases a safety-pin and adjusts a cartridge in position to be discharged.  It is equally unreasonable to assert that an assailant has not the present ability to commit a violent injury upon the person of another by means of a sword or dagger because it is necessary to first withdraw the weapon from a scabbard which hangs by his side." (*Simpson*, at pp. 651-652.)

The testimony was that a pull of the slide would have loaded a round from the magazine into the chamber.  Direct evidence of operability was not required, nor did defendant attempt to produce any evidence the gun was inoperable, leaving the jury with the unrebutted circumstantial evidence outlined above, specifically, defendant's bold conduct with the gun, from which the jury could rationally infer the gun was operable.

## III

### *Ineffective Assistance of Counsel*

Defendant contends trial counsel was ineffective because she (1) conceded his guilt on the evasion count and (2) failed promptly to move to strike certain testimony.  Because the record shows these actions reflected reasonable tactical choices by counsel, defendant's claims are unavailing on direct appeal.  (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

### A.  *Conceding the Evading Charge*

Before trial, defense counsel conceded to the trial court that she did not plan to contest the evading charge, but would focus the defense on the firearm charges.  During opening statements, she argued the evidence would show defendant was not guilty of assaulting anybody.  During an instructional conference, she declined any lesser offense instructions as to the evading charge, conceding defendant must have known the persons chasing him were peace officers, and the trial court agreed "it is hard to imagine how any reasonable juror could conclude . . . that the defendant would not have known at least that there were officers behind him when you consider several minutes of lights and sirens" plus a "caravan" or "surveillance which [was] more like Keystone Cops in some ways,"

6

plus the fact defendant had lists of radio frequencies in his car.  Defense counsel conceded the point.

During closing argument, she explicitly conceded that during the pursuit, "at some point" defendant "knew that those were cops" and although this was not "the most egregious felony evasion" "I can't in good faith tell you that this wasn't a felony evasion. I think there was.  I think it was pretty short."

Detective Reali wore a black vest with gold lettering, four or five inches tall, stating "sheriff" across the front, and he had a badge displayed on his gun belt.  Sergeant Coauette's vest had "sheriff written in two-inch letters across the front" and his radio had a "velcroed badge" on it.  Reali testified that after defendant left the shopping mall parking lot, which itself may have been a counter-surveillance maneuver, his passengers and possibly defendant looked back at the unmarked Ford, therefore "we initiated our red lights and blue lights, forward facing, and our siren and advised that we were in pursuit." Coauette saw the passengers looking back at them two or three times.  Defendant responded by speeding up, passing vehicles, driving unsafely, and running stop signs. When the officers closed the distance, the passengers turned their heads and looked back as the Ford's lights were flashing and sirens were sounding.

Given this evidence, trial counsel could rationally conclude there was no purpose in disputing the evading charge, and instead focus her efforts on defeating the more serious charges of assault with a pistol upon a peace officer.  In this connection we observe that counsel's tactic worked in part, because the jury acquitted defendant of assault upon Reali, as charged in count two, although it convicted him of the assault against Coauette, as charged in count one.

"[C]andor may be the most effective tool available to counsel."  (*People v. Mayfield* (1993) 5 Cal.4th 142, 177.)  Counsel could rationally conclude that quibbling about the evading charge would have undermined her credibility in front of the jury.

7

B. *Failure to Move to Strike Testimony*

The trial court ruled the People could not introduce evidence about the nature of the felony warrant for defendant, or his parole status, except to explain that defendant was considered possibly armed and dangerous, and the prosecutor acknowledged he had instructed his witnesses not to discuss such matters.

Detective Reali was asked about defendant and his passengers' actions of looking back at the Ford during the pursuit, and was asked if he knew whether defendant "was aware that there was a warrant for his arrest?" He responded as follows:

> "The information that we received . . . was that he had a felony warrant and that . . . we needed help if he was in Sacramento County and . . . would we assist.

> "I did get other information but I don't think we're allowed to talk about it so --"

Later, outside the presence of the jury, defense counsel explained that she had not objected at the time, so as not to call attention to the issue, and she moved to have the answer stricken, in case of a "read back" of the testimony by the jury, but she did *not* want an admonishment. The trial court granted defense counsel's motion, stating it was "a gratuitous comment that wasn't exactly responsive." Later, defense counsel confirmed that the requested redaction had been done.

Appellate counsel faults trial counsel for not objecting immediately, because the absence of a read-back by the jury means the gratuitous answer was left in its minds and the jury would speculate the information was unfavorable to defendant.[1]

As defense counsel herself pointed out in closing argument, defendant had a felony arrest warrant out, he was known to carry "at least" one gun on him "at all times" and agencies from three different jurisdictions were trying to catch him. Given this

---

[1] There was a read-back request for a different part of Reali's testimony.

8

information, whatever the jury made of the vague reference to "other information," it can hardly have so tainted the jury as to tilt the scales of justice.

Accordingly, we cannot say it was irrational for trial counsel to avoid calling attention to the vague reference.  The reference was not evidence of anything in particular, so counsel's choice to have it redacted from the transcript--rather than emphasize the point--in case of a jury read-back seems reasonable.  The substance of the offending passage was not inherently prejudicial such that any further action was required.  Accordingly, no ineffective assistance of counsel is shown by this record.

### DISPOSITION

The judgment is affirmed.



      DUARTE      , J.



We concur:



     HULL     , Acting P. J.



     MAURO     , J.