Filed 9/4/13  P. v. Campos CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046717 |
| v. | (Super. Ct. No. 09CF1800) |
| JOE ANTHONY CAMPOS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Joe Anthony Campos guilty of being a felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1))[1] for the benefit of, at the direction of, or in association with the Santa Nita criminal street gang and active participation in the Santa Nita criminal street gang.  The trial court found true allegations Campos had prior serious felony convictions and had served three prior prison terms.  After exercising its discretion to dismiss one of the prior serious felony convictions for sentencing (§ 1385, subd. (a)), the trial court imposed a total prison term of 19 years.

Campos claims the trial court violated his Sixth Amendment right to confront adverse witnesses by admitting a statement made by another Santa Nita gang member to a police officer and by prejudicially failing to give instructions on the necessity defense.  He also challenges the sufficiency of the evidence to support the criminal street gang enhancement.  We conclude Campos's claims are meritless and affirm the judgment.

FACTS

1.  *Prosecution Evidence*

   *a.  Circumstances of the Offense*

   In the early morning hours of July 18, 2009, Santa Ana Police Officer Oscar Lizardi and his partner drove through a residential area claimed by the Santa Nita gang.  They were on patrol in that area specifically because there had recently been a gang-related drive-by shooting and murder at a particular house.  When they drove by this house, Lizardi saw a group of three men drinking beer in front of the house.  He knew the men were loitering and drinking beer in public in violation of the Santa Ana Municipal Code, and he decided to stop and ask the men some questions.  As Lizardi and

---

[1] All subsequent statutory references are to the Penal Code unless otherwise noted.

2

his partner got out of their patrol car, two of the three men, Campos and Enrique Zamudio, ran to the backyard. Lizardi gave chase and detained Campos and Zamudio as they were trying to climb over a wall. Both men had loaded guns. Lizardi saw Campos throw a semiautomatic handgun over the wall. He tased Campos and Zamudio, and a chrome revolver fell out of Zamudio's pants. The third man, Alfred Vera, was detained without incident.

Lizardi arrested Campos and Zamudio and transported them to the Santa Ana Police Department. During his interview with Lizardi, Zamudio admitted he was a Santa Nita gang member. Campos also admitted he had been "walked" into the gang because he grew up in the neighborhood.

### b. Gang Expert Testimony

Santa Ana Detective Gil Hernandez testified as the prosecution's gang expert. Hernandez, an 11-year veteran with over a hundred hours of formalized gang training with an emphasis in traditional Hispanic street gangs, testified that he had spoken with innumerable gang members, their families and friends, and other law enforcement officers to ascertain the customs, habits, and traditions of criminal street gangs. Hernandez said traditional Hispanic street gangs claim a specific geographic location as their turf, and they use gang-related graffiti to mark this turf. Signs and symbols used in graffiti are also used as tattoos that represent the gang, and individual gang members use nicknames or monikers to refer to each other.

Hernandez explained the importance of respect to gang members, something which is often gained through acts of violence. He also said criminal street gangs thrive in an environment of fear and intimidation. According to Hernandez, the tool of the trade for street gangs is the gun, and a traditional Hispanic street gang will collect guns to be used by individual gang members.

3

Hernandez testified there were over 50 members in Santa Nita in July 2009. The gang uses several symbols including, an abbreviation for Santa Nita (SN), "Ese Ene," which represents the letters SN in Spanish, and a cane and top hat. The gang also claims the color baby blue. Hernandez testified Santa Nita is a traditional Hispanic street gang. The gang claims a territory within Santa Ana that includes the neighborhood where the instant offenses occurred as well as the previous gang-related drive-by shooting.

Based on his research into Santa Nita, Hernandez said the gang's primary activities are firearm possession and vehicle theft, and he had personally arrested Santa Nita gang members for vehicle theft. He also testified about two predicate crimes. One occurred in May 2007 when Jonathan Gabriel Martinez pled guilty to vehicle theft and active participation in the Santa Nita criminal street gang. The other occurred in August 2007 when Elias Diaz was convicted of vehicle theft and active participation in the Santa Nita gang.

In anticipation of his testimony, Hernandez reviewed field identification cards and other records that documented Campos's numerous contacts with law enforcement between 1996 and 2007. According to his research, Campos was often in the gang's claimed territory despite the fact he had moved to Anahiem in 2003 or 2004. When contacted by police, Campos frequently admitted his membership in Santa Nita, and he was often found in the company of other Santa Nita gang members. He admitted having the gang moniker "Crazy Joe."

Based on his research and personal experience, Hernandez opined Campos was an active participant in Santa Nita in July 2009. Hernandez also testified the instant offenses were committed in association with and for the benefit of the Santa Nita gang. He explained that Zamudio and Campos's armed presence at the scene of a recent gang-related homicide was an act of respect for a fallen Santa Nita gang member, and it also proved their continued allegiance to the gang.

4

When asked a hypothetical question based on the facts of the case, Hernandez testified, "In my opinion [Campos's actions] both benefits the gang and it's in association with the gang. It benefits the gang, because, like I said, other members of the gang, whether it's younger members, members of that generation, rival gang members, they note that the gang is still standing tall, they're still out there, they're not afraid, they're willing to retaliate if someone else comes in their neighborhood. The community sees them out there. The community is aware of that the homicide just took place and there is no change, gang members are still out in front possibly for another homicide or for some type of retaliation. And so people recognized this and they benefit because they continue their intimidation and instilling fear in the community, instilling fear and gaining respect for other rival gangs. That's how they benefit from it. [¶] In association with when you're standing with other members of the gang, standing tall together representing you gang at that location, despite the threats to your life or to anybody that is there with you, that is a symbol. It's symbolism. It's a sign that, like I said, regardless of the circumstances you're willing to be there together with your fellow gang members regardless of the threat."

## 2. *Defense Evidence*

Vera testified on Campos's behalf at trial. Vera said he met Campos about 22 years before this incident when they were young and belonged to different street gangs. Vera got out of the gang life and believed Campos had too. Vera had come back to the neighborhood to visit a relative, and then decided to pay his respects to the murdered victim's family. The police officers drove up about 20 minutes after he started talking to Campos and Zamudio.

Campos, who was 45 at the time of the instant offenses, testified he moved to Santa Ana at the age of four and joined the Santa Nita gang during high school. Tony Lopez, the Santa Nita gang member who had been murdered, was his childhood friend.

5

He said he moved to Anaheim in 2003 or 2004 and ceased his association with Santa Nita. But he admitted pleading guilty to possession of ammunition and active participation in Santa Nita in 2001. He also admitted stealing cars and possessing firearms for the benefit of the Santa Nita gang.

Campos's attorney questioned him at length about his many tattoos. Campos said some of these tattoos symbolized Southern California, others memorialized various family members, and some are just works of art. He did admit to having at least one gang-related tattoo, "ESE ENE," but claimed to have tried to block out this tattoo in 2006 or 2007.

Campos testified his sole purpose for going into Santa Nita gang territory on July 18, 2009 was to pay his respects to Lopez's family. He said he had not brought the gun with him, but that he had found it stashed in a beer carton in the Lopez's garage. Fearing Lopez's son would use the gun in an act of retaliation, Campos decided to put the gun in his pants pocket, grab some beer, and walk out to the front yard of the house. Vera arrived sometime later, and the police followed soon after.

Campos denied being a current active participant in Santa Nita, and he claimed he did not possess the gun in an effort to benefit the gang. Although he claimed to have grabbed the gun to protect Lopez's son, he also admitted knowing how to remove the magazine and shells from the gun, and he acknowledged that simply moving and hiding the gun could have made the situation safer.

DISCUSSION

1. *Evidence*

During a pretrial Evidence Code section 402 hearing and later during trial, defense counsel objected on the prosecution's anticipated use of Zamudio's statement to Lizardi violated his Sixth Amendment right to confront and cross-examine adverse

6

witnesses under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). The following colloquy is the sum total of the challenged testimony at trial: "[The prosecutor] Did you interview Mr. Zamudio? [¶] [Lizardi] Yes, sir. [¶] And did he admit to being a member of the Santa Nita street gang? [¶] . . . [¶] [Lizardi] Yes, sir, he did." The trial court admitted this evidence. On appeal, Campos argues Zamudio's hearsay statement was admitted to prove his own active participation in Santa Nita, and the introduction of this evidence through Lizardi's testimony denied him the right to cross-examine Zamudio.

The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) The object of the confrontation clause is to "ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." (*Maryland v. Craig* (1990) 497 U.S. 836, 845.)

In *Crawford,* the United States Supreme Court held where testimonial evidence was involved, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. at p. 68.) The Supreme Court did not present a comprehensive definition of "testimonial" evidence, but stated the confrontation clause is triggered by "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Id.* at p. 52.) At a minimum, the term "testimonial" applies "to police interrogations." (*Id.* at p. 68.)

However, *Crawford* did not hold or suggest the confrontation clause is implicated by admission of hearsay for nonhearsay purposes. In fact, *Crawford* expressly stated that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9.) This is so because hearsay relied upon by an expert in forming his

7

opinions is "examined to assess the weight of the expert's opinion," not the validity of its content. (*People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210 (*Thomas*.)

The evidence of Zamudio's statement to Lizardi which was relied upon by Hernandez was not offered to establish the truth of the matter asserted, but merely to explain the bases for Hernandez's expert opinion on Campos's gang membership. Thus, the confrontation clause, as interpreted in *Crawford,* is inapplicable. (See *Thomas*, *supra*, 130 Cal.App.4th at p. 1210.) "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Ibid.*)

Furthermore, even if the trial court erred in allowing the admission of the experts' challenged testimony, *Crawford* error is not reversible per se. Rather, any error is subject to scrutiny under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681-682; *People v. Anderson* (1987) 43 Cal.3d 1104, 1128, superseded by statute on another ground as stated in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 163, fn. 20.) We conclude any error in admitting evidence of Zamudio's membership in Santa Nita was harmless beyond a reasonable doubt in Campos's trial.

The prosecution presented ample evidence Campos was an active participant in Santa Nita in July 2009, and that he possessed a gun to further and promote the gang's interests. Campos was arrested at a home in Santa Nita's claimed territory where a gang-related murder had occurred the week before. He and Zamudio, an admitted Santa Nita member at the time, were armed and standing in front of the home. As Hernandez described it, they benefited or promoted the gang by protecting the gang's turf. The admission of Zamudio's statement to Lizardi did not assist Campos, but a

8

single statement amidst a sea of Campos's own claims of gang membership hardly renders Campos's trial a miscarriage of justice.  In this case, any error in the admission of Zamudio's hearsay statement in conjunction with the prosecution's gang expert testimony was harmless beyond a reasonable doubt.

*2.  Sufficiency of the Evidence*

Campos does not challenge the sufficiency of the evidence to prove Santa Nita is a criminal street gang as defined in section 186.22, subdivision (f), or that he actively participated in this gang as defined in section 186.22, subdivision (a).  He limits his challenge to the sufficiency of the evidence to whether the prosecution proved beyond a reasonable doubt he possessed a gun "with the specific intent to promote, further, or assist in any criminal conduct by gang members" as required by section 186.22, subdivision (b)(1).

The standard of review that governs a criminal defendant's challenge to the sufficiency of the evidence to support a conviction also applies when a criminal defendant challenges the sufficiency of the evidence to support a gang enhancement finding.  (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.)  When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value (*People v. Avila* (2009) 46 Cal.4th 680, 701), and "[w]e must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.)  "Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.)  Further, "[w]e 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.  [Citation.]' [Citation] . . . . '[I]t is the jury, not the appellate court that must be convinced of the

9

defendant's guilt beyond a reasonable doubt. [Citation.]'" (*People v. Zamudio* (2008) Cal.App.4th 327, 357-358.)

To prove a gang enhancement allegation under section 186.22, subdivision (b)(1), the prosecution must prove (1) that the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang, and (2) that the defendant had the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1); *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617.) The specific intent requirement in section 186.22, subdivision (b) requires the prosecution to prove that the defendant committed the crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members." The specific intent required under the gang-enhancement statute is the specific intent to assist "gang members." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198; *People v. Villalobos*, *supra*, 145 Cal.App.4th at p. 322.) This requirement is satisfied when the evidence demonstrates the defendant committed a crime "in concert with known gang members." (*People v. Villalobos*, *supra*, 145 Cal.App.4th at p. 322, citing *Morales*, *supra*, 112 Cal.App.4th at p. 1198.)

Here, Campos and Zamudio, both active Santa Nita participants armed with loaded guns, stood watch over the home where their fellow Santa Nita gang member had been shot and killed just days earlier. Hernandez testified their actions reinforced the gang's presence in the neighborhood and demonstrated the gang was still together and prepared to defend itself. Such evidence is sufficient to satisfy the specific intent requirement in section 186.22, subdivision (b). (*Morales*, *supra*, 112 Cal.App.4th at p. 1198; *People v. Villalobos*, *supra*, 145 Cal.App.4th at p. 322.) The fact Campos testified he intended to prevent violence by confiscating the gun is irrelevant because the jury was free to reject his explanation. In this case, substantial evidence supports the jury's conclusion Campos possessed a gun with the specific intent to promote, further, or assist criminal conduct by gang members.

10

*3. Instructional Error*

Campos claims the trial court had a duty to give instructions on the necessity defense. We disagree.

A trial court must instruct on "general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. [Citations.]" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) In addition, the trial court must instruct upon "every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. [Citations.]" (*Ibid.*) On appeal, "[w]e determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] '"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

A criminal defendant is entitled to instructions "concerning a defense *only if there is substantial evidence to support the defense*. [Citations.]" (*In re Christian S.* (1994) 7 Cal.4th 768, 783; *People v. Miceli* (2002) 104 Cal.App.4th 256, 267.) A criminal defendant seeking to rely on the necessity defense must demonstrate he or she violated the law "(1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency." (*People v. Pepper* (1996)

11

41 Cal.App.4th 1029, 1035.)  The evidence in this case is lacking with respect to all of these elements.

First, moving a gun from where it has been secreted and putting it in your pants pocket does not make it *less* likely the gun will be used.  Second, Campos himself testified he could have disassembled the gun, or hidden it somewhere not as accessible as the box of beer, both of which were adequate alternatives.  He also admitted he could have asked someone else, presumably someone without limitations on their use and possession of guns, to remove the gun from the scene.  And finally, if safety truly had been foremost on Campos's mind, he could have waited for the police officers to contact him and then told them about the gun.  Instead, Campos pocketed a gun with full knowledge he was prohibited from doing so and then ran away when police officers stopped to talk to him.  Under these circumstances, Campos substantially increased the likelihood of someone being injured or killed by the gun he purportedly sought to make safe.  Thus, there was insufficient evidence to trigger the trial court's sua sponte duty to give instructions on the necessity defense

DISPOSITION

The judgment is affirmed.

THOMPSON, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

12