Filed 2/24/15  P. v. Delacruz CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B251463 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  PA068137) |
| v. | |
| CORENE DELACRUZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Harvey Giss, Judge.  Affirmed as modified.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Corene Delacruz was convicted of assault with a firearm and other offenses arising out of a shooting incident involving James Calderon. She contends the judgment must be reversed due to instructional and sentencing error. We reject those challenges to the judgment, with the exception of her contention that the trial court miscalculated her presentence custody credits. Accordingly, we modify the judgment to remedy that error, and affirm the judgment so modified.

**RELEVANT PROCEDURAL BACKGROUND**

On November 29, 2010, an information was filed, charging appellant in count 1 with first degree burglary (Pen. Code, § 459); in count 2, with the attempted willful, deliberate, and premeditated murder of James Calderon (Pen. Code, §§ 187, subd. (a), 664); in count 3, with making criminal threats (Pen. Code, § 422); in count 4, with carrying an unregistered loaded handgun (Pen. Code § 12031, subd. (a)(1)); in count 5, with assault with a firearm on Calderon (Pen. Code, § 245, subd. (a)(2)); and in count 6, with the false imprisonment of Calderon by violence (Pen. Code, § 236).[1] Accompanying counts 1, 2, 3, 5, and 6 were gun use allegations (§§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d)); in addition, accompanying counts 2, 5, and 6 were allegations that appellant had inflicted great bodily injury upon Calderon (§§ 12022.53, subd. (d), 12022.7, subd. (e)). Appellant pleaded not guilty and denied the special allegations.

A jury found appellant not guilty of attempted murder, and guilty of all the remaining charged offenses. In addition, the jury found true the special allegations regarding the latter charges. The trial court sentenced appellant to a cumulative term of 22 years and eight months, comprising the six-year upper term for burglary (count 1) and enhancements totaling 15 years for that offense (§§ 12022.5, subd.

2

(a), 12022.7, subd. (e)), plus consecutive terms of eight months and one year, respectively, for carrying an unregistered loaded handgun (count 4) and assault with a firearm (count 5). Sentences regarding the remaining offenses were imposed and stayed (§ 654).

## FACTS

A. *Prosecution Evidence*

In 1999, James Calderon and appellant began what Calderon characterized as an "[o]n and off" relationship that lasted approximately 11 years, during which they sometimes lived together. In June 2010, Calderon ended the relationship. According to Calderon, after that break up, appellant repeatedly called and texted him in what he regarded as a harassing manner, and sometimes appeared uninvited at his residence. In early July 2010, he installed a surveillance camera with an audio and video recording system in his house.

Matthew Villa testified that in June 2010, appellant asked to borrow his gun in order to go shooting with friends. According to Villa, when he loaned the gun to appellant, the magazine clip had rounds in it but was detached from the gun, and the gun itself had no bullets in its chamber. Upon loaning appellant the gun, Villa instructed her regarding the safe use of the weapon, and told her never to point a loaded gun at a person.

Calderon testified that on July 4, 2010, at approximately 11:30 a.m., he was alone in his home when appellant appeared at his door. After a brief conversation, appellant went to her car, and Calderon closed the front door. Carrying a blanket that belonged to Calderon's godmother, appellant returned to Calderon's front door, and rang the door bell. When Calderon opened the door and asked why

---

**1**    All further statutory citations are to the Penal Code.

3

appellant was there, she rushed toward him.  Calderon heard a loud noise, fell backward, and discovered wounds on his body near his stomach and hip.

Appellant entered the house, locked the door, and pointed a gun at Calderon. Appellant said, "I came here to kill myself and I came here to kill you and I want your family to feel the pain that I'm feeling."  Calderon got to his feet, saw that his wounds were bleeding, and said to appellant, "You shot me."  Appellant then asked where Calderon's cell phone was located.  When Calderon replied that it was in his room, she closed the door to that room, while continuing to aim her gun at him.  Calderon begged her to stop, told her that he did not want to die, and asked her to make a 911 call.  She did not do so.  Later, after experiencing intense pain and difficulties in breathing, Calderon said, "Look at me.  I'm gonna die. . . .  Help me, please.  It's still not too late."  Appellant asked, "You promise if I leave you're gonna tell them it wasn't me, it was someone else[?]"  Although Calderon agreed, appellant "got an angry look on her face," and replied, "No, I don't trust you."

Calderon then became desperate.  When appellant briefly looked away from him, he jumped toward her, punched her, and grabbed for the gun.  During their struggle over the gun, its bullet magazine came loose.  Calderon seized the magazine and pocketed it.  Appellant, who retained the gun, made an apparent effort to shoot Calderon, who thought that the gun might hold a bullet in its chamber.  When appellant tried to aim the gun at Calderon, he unlocked the front door to his residence and pushed her outside, where their struggle continued. Calderon shoved appellant into some bushes, and fled back into his house.  After locking the door, he called 911.  Later, he underwent major surgery to mend his injuries.

The surveillance system inside Calderon's house recorded the encounter between appellant and Calderon.  Although the surveillance camera viewed the exterior walkway to the residence's front entrance, the audio system captured

4

appellant's and Calderon's remarks inside the residence. Video and audio recordings from the surveillance system were played for the jury.

Gracie Torres, a coworker of appellant's, testified that on July 4, 2010, appellant arrived at her house in an apparent state of shock, with blood on her hands and nose. Appellant told Torres she had gone to Calderon's house to return a comforter and shoot herself. After Calderon called her crazy and said, "Go ahead. Shoot yourself, bitch," a fist fight began. When he punched her, the gun she held "went off." Torres related the incident to her brother, who lived with her and was employed as a Los Angeles Police Department sergeant.

Torres's brother examined appellant's car and found a gun. Investigating officers soon arrived at Torres's house, where they arrested appellant and took possession of the gun, which was determined to belong to Villa.

B. *Defense Evidence*

Appellant testified as follows: After she and Calderon broke up, she borrowed Villa's gun, and falsely told him she intended to go shooting with friends. According to appellant, she was contemplating suicide.

On July 4, 2010, prior to visiting Calderon, she held the gun to her head, but was unable to pull the trigger. At approximately 11:15 a.m., she phoned Calderon from her home to tell him she intended to visit him. She planned to return a blanket to Calderon, and also contemplated suicide by shooting herself with Villa's gun. Appellant denied intending to shoot Calderon. She testified she loved Calderon, and hoped they would have a conversation that would result in their reconciliation. According to appellant, she took Villa's gun with her to show Calderon she was serious about hurting herself.

After appellant arrived at Calderon's residence, he opened the front door and asked why she was there. When she said she wanted to return the blanket, he

5

cursed at her and shut the door.  She went to her car, grabbed the blanket and the gun, and walked back to Calderon's front door, carrying the blanket in her left hand and the gun in her right hand.  According to appellant, her finger was behind -- not on -- the gun's trigger.

After appellant rang the doorbell, Calderon cursed at her again and opened the door.  When appellant stated she wanted to return the blanket, the pair began arguing.  During the argument, Calderon said, "You're on camera," stepped outside the house, and looked to appellant's right.  Calderon then grabbed appellant's shirt and pulled her into the residence, causing both appellant and Calderon to fall.  There was a loud bang, and Calderon screamed, "You shot me. You shot me."  According to appellant, the shooting was "an accident."

Following the gunshot, appellant was shocked and hysterical.  According to appellant, although there was a hole in Calderon's shirt, she saw no blood, and he "was walking fine."  He said, "It's okay.  The bullet came out."  Appellant repeatedly told Calderon she never meant to hurt him, and that she had come to his residence to kill herself.

As appellant and Calderon talked, he began to "manipulate[] her."  While walking closer to her, he offered to tell the police that his injuries were the result of a robbery not involving her.  Appellant concluded that Calderon was "cornering [her] in," that "everything [had] changed," and that she "need[ed] to save [her]self."  She told Calderon she did not trust him, and in order to scare him away, she threatened to shoot him again, and at one point held the gun to her own head. Appellant denied intending to shoot Calderon, and denied pointing the gun at him.

When appellant realized she could flee through the open front door, she felt safe enough to lower the gun to her side.  Calderon then bit her shoulder, punched her repeatedly with his fists, and tried to seize the gun.  During the ensuing struggle, appellant was fearful that Calderon would use the gun to shoot her.

6

When appellant managed to open the front door, Calderon pushed her outside and into some bushes.

## DISCUSSION

A. *Instructions Regarding the Accident Defense*

Appellant contends the trial court, in instructing the jury regarding the defense of accident, limited the defense to the charges of burglary (count 1) and attempted murder (count 2), and improperly failed to inform the jury that the defense was also applicable to assault with a firearm (count 5). As explained below, she has failed to establish reversible error.

1. *Governing Principles*

The defense of accident ordinarily is raised to rebut the mental element of a crime. (*People v. Anderson* (2011) 51 Cal.4th 989, 996 (*Anderson*); *People v. Lara* (1996) 44 Cal.App.4th 102, 110 ["The accident defense amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime."].) Section 26 "states the statutory defense: 'All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Five -- Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence.' The defense appears in CALCRIM No. 3404, which explains a defendant is not guilty of a charged crime if he or she acted 'without the intent required for that crime, but acted instead accidentally.'" (*Anderson*, *supra*, 51 Cal.4th at p. 996.)

The application of the defense to assault with a firearm thus hinges on the state of mind required for that crime. Assault with a firearm is a general intent crime. (*People v. Williams* (2001) 26 Cal.4th 779, 782-784 (*Williams*).) The nature of the requisite general intent arises from the relationship between the

offenses of assault and battery. (*People v. Colantuono* (1994) 7 Cal.4th 206, 214.) "Assault . . . lies on a definitional . . . continuum of conduct that describes its essential relation to battery: An assault is an incipient or inchoate battery; a battery is a consummated assault. . . . The criminal law . . . independently sanctions the initiation of force or violence -- the 'assault' -- because it directly and immediately culminates in injury -- the 'battery.' [Citation.] Based on this apposition, each constitutes a discrete offense . . . . [Citations.]" (*Id*. at pp. 216 -217.)

The relationship between assault and battery determines the precise mental state required for assault. (*Williams*, *supra*, 26 Cal.4th at p. 785.) Our Supreme Court has explained: "[A] defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' [Citation.]" Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery." (*Id*. at pp. 787-788.)

Accordingly, to establish the requisite mental state for assault, the prosecution need only show that the defendant engaged in "an intentional act" and had "actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Williams*, *supra*, 26 Cal.4th at p. 790.) However, because assault requires neither a specific intent to injure nor an subjective awareness of the risk that a battery might occur, the existence of the requisite mental state does not hinge on the defendant's own subjective assessment of the likelihood of a battery. (*Id*. at pp. 782-783, 788.) "For example, a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly,

naturally and probably result in a battery." (*Id*. at p. 788 & fn. 3.) Nonetheless, "mere recklessness or criminal negligence is still not enough [citation][] because a jury cannot find a defendant guilty of assault based on facts he should have known but did not know . . . ." (*Williams*, *supra*, 26 Cal.4th at p. 788, fn. omitted.)

### 2.  *Underlying Proceedings*

At trial, appellant testified that although she carried a gun to Calderon's front door, her intent was not to injure him, but to demonstrate that she was serious about hurting herself.  She further testified that the gun went off only because Calderon grabbed her, causing them both to fall.  Appellant acknowledged that after Calderon was injured, she threatened to shoot him again, but she denied that she intended to fire the gun, and maintained that she never pointed the gun at him.

During a break in appellant's testimony, the trial court stated to her counsel: "I do want to say this now.  Based on the testimony of your client, it seems that this case would generate . . . an accident instruction . . . ."  After counsel replied, "Yes," the court stated that the instruction would be discussed later.  Following the close of the presentation of evidence, the court proposed a packet of jury instructions that included a modified version of CALCRIM No. 3404 applicable to the charges of burglary and attempted murder.  Counsel neither objected nor requested that the instruction also encompass assault with a firearm.

Regarding assault with a firearm, the jury was instructed with CALCRIM No. 250, which stated that the offense "require[d] proof of the union, or joint operation, of act and wrongful intent, that "[a] person acts with wrongful intent when he or she intentionally does a prohibited act . . . ."  Furthermore, the jury was instructed with CALCRIM No. 875, which stated that appellant committed the offense only if she willfully "did an act with a . . . firearm that by its nature would directly and probably result in the application of force to a person," while "aware

9

of facts that would lead a reasonable person to realize that [her] act by its nature would directly and probably result in the application of force to someone." CALCRIM No. 875 also stated: "Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage."

In closing arguments, defense counsel maintained that appellant was not guilty of the charges against her because the fall that caused the gun to fire was accidental. He asserted; "[T]he truth is that she did not intentionally shoot that gun. The truth is that this was a horrible, horrible, horrible incident, but it was an accident that he got shot."

### 3. *Analysis*

Appellant contends the trial court erred in instructing the jury with a modified version of CALCRIM No. 3404 limited to burglary and attempted murder, arguing that the instruction effectively informed the jury that the defense of accident was inapplicable to assault with a firearm. We conclude that appellant has forfeited her contention for want of a request that the instruction encompass assault with a firearm, and that even were we to consider it, she has shown no prejudicial error.

Generally, when the jury otherwise receives "complete and accurate" instructions regarding the mental element required for a crime, "the obligation of the trial court . . . to instruct on accident extend[s] *no further than to provide an appropriate pinpoint instruction upon request by the defense*." (*Anderson*, *supra*, 51 Cal.4th at p. 998, italics added, fn. omitted.) Furthermore, if the trial court has no duty to instruct sua sponte regarding a matter, a defendant who fails to request such an instruction may not complain on appeal that "'an instruction correct in law

and responsive to the evidence was too general or incomplete.'" (*People v. Valdez* (2004) 32 Cal.4th 73, 113, quoting *People v. Lang* (1989) 49 Cal.3d 991, 1024.)

Under these principles, appellant's failure to request an instruction specifically directed at the charge of assault with a firearm forfeited the contention she raises on appeal. The crux of that contention is that CALCRIM No. 3404, as given, was "correct in law and responsive to the evidence" with respect to the charges of burglary and attempted murder, but was incomplete, that is, did not encompass the charge of assault with a firearm. However, because the jury received "complete and accurate" instructions regarding the mental state required for assault with a firearm, appellant was obliged to request a pinpoint instruction regarding the application of the defense to that crime. (*Anderson*, *supra*, 51 Cal.4th at pp. 996-998.) Accordingly, she has not preserved her contention of error on appeal.

Furthermore, we would conclude that appellant has shown no prejudicial error were we to address her contention. Generally, the failure to give a requested pinpoint instruction on a defense theory is reviewed for prejudice in light of the test stated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Earp* (1999) 20 Cal.4th 826, 886-887.) Under that test, an error is reversible only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) Because the accident defense is intended to rebut the mental state required for assault with a firearm, when the trial court fails to give requested instructions on the defense in relation to that offense, no prejudice is ordinarily demonstrated if the jury was otherwise adequately instructed regarding the mental state required for the offense. (*People v. Sandoval* (1963) 222 Cal.App.2d 348, 352-353.)

Here, the absence of an instruction on accident cannot be regarded as prejudicial, as the jury was adequately instructed regarding the state of mind

11

required for assault, and the record otherwise discloses ample evidence of an assault with a firearm involving no purportedly accidental conduct. Generally, "[t]o point a loaded gun in a threatening manner at another (especially if accompanied by threats to shoot . . . ) constitutes an assault . . . ." (*People v. Miceli* (2002) 104 Cal.App.4th 256, 269.) At trial, Calderon testified that appellant appeared at his front door, shot him, and continued to point the gun at him. He further testified that when he asked her to make a 911 call because he feared he was dying, she refused. According to the transcript of the audio recording and appellant's own testimony, rather than assisting Calderon, appellant threatened to shoot him again. There is thus abundant evidence that appellant committed an assault with a firearm *after* the purportedly accidental fall that caused Calderon's injuries. Accordingly, it is not reasonably likely that appellant would have secured a more favorable outcome had the jury been instructed that the defense of accident was applicable to assault with a firearm.

Appellant contends the absence of a pertinent instruction was prejudicial, arguing that because the version of CALCRIM No. 3404 given to the jury omitted the count regarding assault with a firearm, the court "telegraphed the idea that accident was not a defense to that count," and thus undermined appellant's central defense. We disagree. Although defense counsel, in closing argument, relied on the purportedly accidental fall to establish appellant's lack of guilt, her culpability for assault with a firearm did not hinge on the defense of accident. The fundamental issue regarding appellant's culpability for that offense was not whether the initial fall was accidental, or whether appellant fired her gun during the fall without the mental state required for assault with a firearm, but whether she acted with the requisite mental state *at any time*, that is, whether she engaged in *any* intentional conduct with knowledge of facts establishing the reasonable likelihood of a battery. As explained above, the instructions given accurately

12

informed the jury regarding that fundamental inquiry, and there was considerable evidence that after the shooting at Calderon's front door, appellant engaged in an assault with a firearm.

Appellant also contends the prosecutor misinformed the jury regarding application of the defense of accident to appellant's version of the incident. During closing arguments, in discussing the charge of assault with a firearm, the prosecutor stated: "[N]o matter what you believe in terms of [appellant's] version of the facts, I submit to you that she's guilty on this one . . . ." He maintained that according to appellant's testimony, she "purposefully and willfully" stood at Calderon's front door holding a loaded handgun hidden under a blanket, with the gun's muzzle pointed toward the door. He further contended that appellant showed a "clear, conscious disregard for human life," and that "she used the gun in a manner that made it likely that [Calderon] would be struck . . . ." The prosecutor asserted: "[I]f you believe [appellant] intentionally fired the gun, she's guilty of [assault with a firearm]. If you believe she did it [by] accident, *if she used the gun in a manner that made it likely that [Calderon] would be struck*, she's still guilty."

In view of the language italicized above, we discern no error in the prosecutor's argument. As explained above (see pt. A.1., of Discussion, *ante*), even when a defendant has the honest belief that she is not likely to apply force to her victim, she may be guilty of assault "if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Williams*, *supra*, 26 Cal.4th at p. 788 & fn. 3.) The essence of the prosecutor's argument was that even if appellant had done "it"-- that is, fired the gun -- by accident, she would be guilty of assault with a firearm if her prior intentional conduct displayed a "clear, conscious disregard" of facts establishing the likelihood of injury to Calderon. Because the argument accurately reflects the

13

principles governing assault with a firearm, it was not improper.  In sum, appellant has shown no reversible instructional error.

B.  *Imposition of Upper Term on Burglary and Accompanying Enhancements*

Appellant contends the trial court erred in imposing the upper term on the burglary count and the accompanying enhancements.  She argues that the court improperly disregarded evidence that she had no prior criminal record and committed her crimes while suffering from suicidal depression.  As explained below, we disagree.

1.  *Governing Principles*

When a sentence of imprisonment is imposed, the trial court has discretion to select the middle, upper or lower term on the basis of circumstances in aggravation or mitigation.  (Cal. Rules of Court, rule 4.420(b).)  Generally, "[a] single factor in aggravation will support imposition of an upper term.  [Citation.]" (*People v. Cruz* (1995) 38 Cal.App.4th 427, 433.)  We review the trial court's findings concerning aggravating and mitigating factors for the presence of substantial evidence (*People v. Gragg* (1989) 216 Cal.App.3d 32, 46), and the trial court's balancing of aggravating and mitigating factors for abuse of discretion (*People v. Hetherington* (1984) 154 Cal.App.3d 1132, 1140-1141).

2.  *Underlying Proceedings*

In a report dated December 21, 2011, psychologist Nancy Kaser-Boyd provided defense counsel with the results of an evaluation of appellant she had performed after the inception of the underlying proceedings.  Kaser-Boyd opined that at the time of the alleged crimes, appellant was suffering from a "[m]ajor

[d]epressive [e]pisode" precipitated by the breakup of her relationship with Calderon. According to Kaser-Boyd, as appellant "display[ed] the effects of intimate partner battering," her plan to commit suicide in front of Calderon was not "unusual."

Shortly before the commencement of trial, the court and counsel discussed Kaser-Boyd's report. The court stated that it had read the report, and asked defense counsel to describe his purposed uses of the report, including whether counsel intended to call Kaser-Boyd "for . . . sentencing purposes if there is a conviction[.]" Defense counsel stated that the report raised "several issues," and that he did not contemplate calling Kaser-Boyd as an expert witness at trial unless appellant herself testified.

Appellant testified that during her relationship with Calderon, they both said "hurtful things" to each other. At various times, Calderon called her a psychopath, moron, bitch, and whore; in addition, he described her as fat. Following her breakup with Calderon, she contemplated suicide. According to appellant, before the underlying incident, she sought therapy from Dr. Peter Adler, and discussed her thoughts of suicide with him. In describing her mental state immediately prior to the shooting, she stated: "I wasn't in the right state of mind. I was so confused. I was depressed. I was going through so many mixed emotions." Following appellant's testimony, defense counsel did not call Kaser-Boyd as a witness.

After the jury returned its verdicts, the prosecution submitted a sentencing memorandum requesting that the court select the burglary conviction as the principal count, and impose the upper term on that conviction and the accompanying enhancements. The prosecution maintained that there were several aggravating circumstances, namely, that the crime displayed planning and great violence (Cal. Rules of Court, rules 4.421(a)(1) & (a)(8)), that appellant was armed (Cal. Rules of Court, rule 4.421(a)(2)), and that the victim was particularly

15

vulnerable (Cal. Rules of Court, rule 4.421(a)(3)). The prosecutor further argued that appellant's lack of a criminal record constituted the sole mitigating factor (Cal. Rules of Court, rule 4.423(b)(1)).

Appellant's response to the prosecution's sentencing memorandum asked the court to select the burglary conviction as the principal count, impose the middle term on that conviction, and impose middle or low terms on the related enhancements. Appellant argued there were two mitigating factors: that she had no criminal record, and that she had suffered abuse from Calderon while they were intimate cohabitants (Cal. Rules of Court, rule 4.423(a)(9)). Appellant's response further stated that Kaser-Boyd's December 21, 2011 report was "incorporated herein."

At the sentencing hearing, after describing the trial evidence supporting the jury's verdicts, the court stated that its tentative ruling was to impose the upper term on the burglary and its accompanying enhancements. In summarizing the trial evidence, the court noted: "[Appellant] and [Calderon] had a long term relationship. [¶] [Appellant] was of the opinion that [Calderon] mistreated her during that time frame."[2] Furthermore, in discussing appellant's acquittal on the charge of attempted murder, the court concluded the jury must have decided that the shooting was accidental, and remarked: "Frankly[,] I thought the jury was extremely charitable in buying her explanation of what happened at the door."

Although the court accepted appellant's account of the shooting because "that apparently is what the jury believed," the court otherwise rejected appellant's testimony regarding the remaining portions of the underlying incident. Pointing to

---

[2]     We recognize that the trial court actually stated: "The victim was of the opinion that the defendant mistreated her during that time frame." Viewed in context, however, the statement reasonably reflects only a slip of the tongue regarding the identities of the victim and defendant.

the transcript of the audio recording from Calderon's surveillance system, the court stated: "I think anyone's opinion after reading this transcript and knowing what transpired is that this is a gruesome, bloodcurdling conversation between the shooting victim and a vengeful, narcissistic, self-centered defendant who callously refuses to get help and threatened to shoot him again and again in the head, this time out of fear of him telling the police what happened."

The court thus found the aggravating circumstances identified by the prosecution. In discussing whether the crime showed planning, the court remarked: "[Appellant] has no record, but . . . she made it very clear from her testimony [that] she borrowed a gun from someone she knew . . . , and she brought that gun to this incident." The court further stated: "[C]ircumstances in mitigation, under [California Rules of Court, rule] 4.423[,] I found none whatsoever."

In response to the court's tentative ruling, defense counsel stated that he offered Kaser-Boyd's report to support the existence of a mitigating factor, namely, that appellant had suffered repeated abuse from Calderon while they were cohabitants. The following colloquy then occurred:

"The Court: There was no proof. Nobody ever put on any proof to that effect.

"[Defense Counsel]: I understand.

"The Court: I read the doctor's report. You wanted me to read it before the trial began. . . . [¶] I read it for a different reason . . . . I read it for purposes of making a determination as to how I should rule if you tried to get that into evidence, but there was no evidence presented to the jury -- [¶] . . . [¶] . . . .

"[Defense Counsel]: But I am using it simply to enlighten the court and to expand the record in the sentencing that she had a long history of depression . . . . [¶] She had said goodbye to her family. She was going to kill herself. [¶]

17

She was in the throes of a huge depression and despair; and I'm asking the court to look . . . [at] sentencing [in] that context[. T]his did not happen in a vacuum; and yes, it was a horrible incident; and yes, the victim almost died; but it was situational and this is a woman who had never been in trouble before . . . . [¶] . . . [¶] I know the court feels that maybe the jury was in error on the attempted murder, but --

"The Court: I'm not saying that. I'm saying they gave her a break. It could be construed that the gun went off accidentally at the threshold of the door."

After defense counsel suggested the jury also believed that appellant intended to kill herself at Calderon's house, the court remarked that appellant never, in fact, made any attempt to commit suicide throughout the incident, even though that "was her whole motive allegedly." In response, defense counsel argued that appellant never shot Calderon again after the initial shooting. The court replied: "She didn't have to. His life was slowly ebbing away . . . ." The court further observed: "[Appellant] didn't want him calling the police because he was going to tell on her. [¶] . . . [B]ecause . . . she's a narciss[ist] she could care less about him. She was concerned with number one."

Shortly afterward, the court imposed sentence in accordance with its tentative ruling.

### 3. *Analysis*

Pointing to the court's remark, "[C]ircumstances in mitigation, . . . I found none whatsoever," appellant contends the court abused its discretion in imposing sentence. She argues there was undisputed evidence that she had no criminal record (Cal. Rules of Court, rule 4.423(b)(1)). In addition, she argues there was considerable evidence -- including Kaser-Boyd's report -- that she "was suffering from a mental . . . condition that significantly reduced culpability for the crime"

18

(Cal. Rules of Court, rule 4.423(b)(2)), namely, a suicidal depression, and that she had suffered repeated abuse from Calderon (Cal. Rules of Court, rule 4.423(a)(9)).[3] As explained below, we discern no error.

Generally, the trial court, in determining the appropriate term for a crime, "need not state reasons for minimizing or disregarding circumstances in mitigation . . . ." (*People v. Lamb* (1988) 206 Cal.App.3d 397, 401.) The court "will be deemed to have been considered [the sentencing criteria stated in the rules] unless the record affirmatively reflects otherwise." (Cal. Rules of Court, rule 4.409.) Moreover, the court's remarks must be interpreted in context. (See *People v. Sanders* (1995 ) 11 Cal.4th 475, 566; *People v. Melton* (1988) 44 Cal.3d 713, 770-771.) Thus, in *Melton*, a death penalty case, the defendant argued that the trial court's remark that it found no mitigating circumstances established that the court misunderstood its duty to consider all mitigating evidence. (44 Cal.3d at pp. 770-771.) Our Supreme Court concluded that the remark conveyed the trial court's conclusion that the aggravating considerations outweighed all mitigating considerations, as the trial court's other remarks reflected a correct understanding of its duties. (*Ibid*.)

We reach a similar conclusion here. The record discloses that the court examined the sentencing memorandum and response, assessed the evidence in the record, and found the aggravating circumstances identified by the prosecution. In so doing, the court expressly noted that appellant lacked a criminal record.

---

[3] Aside from Kaser-Boyd's report, appellant points to her own trial testimony, as described above (see pt. B.2., of Discussion, *ante*), as well as testimony from Torres. According to Torres, after appellant and Calderon broke up, appellant said she wanted to commit suicide. Torres also stated that Calderon left telephone messages for appellant containing abusive language.

The record further discloses that the court, in assessing mitigating circumstances, appears to have considered all the evidence, including Kaser-Boyd's report. In summarizing the trial evidence, the court expressly noted appellant's claim that Calderon had acted abusively toward her. Although the court remarked that "no proof" of Kaser-Boyd's opinions had been admitted at trial, it stated that it had read the report; furthermore, when defense counsel explained that he relied on the report "to expand the record in the sentencing [to show] that [appellant] had a long history of depression," the court did not rule that the report was inadmissible.[4] Rather, the court rejected defense counsel's claim that appellant's depression arising from her relationship with Calderon constituted a mitigating factor. As the court observed, appellant never, in fact, tried to kill herself, and she otherwise engaged in conduct inconsistent with a plan to commit suicide; she told Calderon she was afraid he would report her conduct to the police, demonstrating that she was looking out for herself as "number one."

The record thus establishes that the court imposed high terms on the burglary count and its accompanying enhancements in light of all the evidence,

---

[4] Even had the court excluded the report, we would find no error. Under rule 4.420(b) of the California Rules of Court, aggravating and mitigating circumstances are properly based only on "reports . . . properly received." When the court excludes evidence on its own motion, we will affirm the ruling on any proper ground established by the record. (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 392, pp. 483-484.)

Generally, in expressing an opinion, an expert is permitted to rely on inadmissible information, provided that the information meets "'a threshold requirement of reliability.'" (*People v. Nelson* (2012) 209 Cal.App.4th 698, 707-711, quoting *People v. Dodd* (2005) 133 Cal.App.4th 1564, 1569.) Nonetheless, an expert "may not in the guise of stating reasons for an opinion bring before [the factfinder] incompetent hearsay evidence." (*People v. Price* (1991) 1 Cal.4th 324, 416.) Accordingly, the report was excludable for want of a threshold showing of reliability, as Kaser-Boyd's opinions relied in large measure on a hearsay account from appellant of events during her relationship with Calderon that appellant did not address during her testimony at trial.

including Kaser-Boyd's report. Furthermore, because the court acknowledged that appellant had no prior criminal record, its statement that it found no mitigating circumstances cannot reasonably be understood to deny the existence of all such circumstances. Viewed in context, the remark appears intended to convey the court's conclusion that the aggravating considerations outweighed any potential mitigating considerations. As the record contains evidence sufficient to support that conclusion, appellant's contention fails.

C. *Custody Credits*

Appellant contends the trial court miscalculated her presentence custody credits. The trial court awarded her custody credits totaling 1148 days. She argues that she is entitled to credit for an additional two days of actual custody. Respondent agrees. We conclude that appellant's custody credits must be corrected to reflect custody credits totaling 1150 days.

**DISPOSITION**

The judgment is modified to reflect that appellant is entitled to custody credits totaling 1150 days.  The trial court is directed to correct the sentencing minute order to reflect the modification stated above, to prepare an amended abstract of judgment reflecting that modification, and to forward the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:



EPSTEIN, P. J.



COLLINS, J.