Filed 3/20/15  P. v. Lewis CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM EDWARD LEWIS II,<br><br>    Defendant and Appellant. | D066868<br><br><br>(Super. Ct. No. FV11000504) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Eric M. Nakata, Judge.  Affirmed with directions.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, Arlene A. Sevidal and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted William Edward Lewis II of one count of first degree murder (count 1) and one count of second degree murder (count 2) (Pen. Code, § 187, subd. (a)).[1] The murder victims were Lewis's girlfriend, Angelina Goffredo, and her fetus. The jury also convicted Lewis of two counts of assault with a firearm (§ 245, subd. (a)(2)) (counts 3 and 5). As to the murder counts, the jury found true allegations that Lewis personally discharged a firearm, causing death, within the meaning of section 12022.53, subdivisions (b), (c), and (d), and that he was convicted of more than one count of murder in a single proceeding, within the meaning of section 190.2, subdivision (a)(3). As to the counts of assault with a firearm, the jury found true allegations that Lewis personally used a firearm within the meaning of section 12022.5, subdivisions (a) and (d). The court sentenced Lewis to life without the possibility of parole plus an indeterminate term of 65 years, consisting of 15 years to life on the second degree murder count and a firearm enhancement of 25 years to life for each of the two murder counts. The court also sentenced Lewis to a determinate term of 18 years four months on the two assault counts and related firearm enhancements.

Lewis contends that (1) there was insufficient evidence that he acted willfully, deliberately, and with premeditation to support his conviction of first degree murder on

---

[1]     All statutory references are to the Penal Code unless otherwise specified.

count 1; (2) there was insufficient evidence to support his conviction of assault with a firearm on count 3; (3) the trial court prejudicially erred by incorrectly instructing the jury on the definitions of express and implied malice with respect to first and second degree murder; and (4) the sentencing minute order and abstract of judgment incorrectly state that his credit for time served of 1,008 days includes conduct credit of 127 days. The People concede that at sentencing, the court awarded 1,008 days of presentence custody credit and did not award any conduct credit. We will direct the court to correct the sentencing minute order and abstract of judgment to reflect its oral pronouncement of presentence credit for time served. We otherwise affirm the judgment.

## II.

## FACTS

*Assault on Angelina Goffredo (count 3)*

In December 2009, Lewis and Goffredo lived together in a house on Duncan Road in Phelan. On December 24, they moved into a house on Smith Road that Lewis's close friend, Amanda Quinn, was renting. At some point in December before the 24th, Lewis telephoned Quinn and told her that he and Goffredo had been arguing. Lewis sounded upset and Quinn heard Goffredo yelling at him in the background. Quinn became concerned and went to Lewis and Goffredo's house with her one of her roommates.

When Quinn and her roommate arrived at the house, the front door was unlocked. They entered the house and went to Lewis and Goffredo's bedroom. The bedroom door was closed but Quinn heard Lewis and Goffredo speaking in the bedroom. Quinn

3

testified that she may have told police that Lewis and Goffredo were arguing, and also may have told police that she heard Goffredo say, "Don't point that gun at me." She thought that she "heard a gun being cocked back." She became worried and told Lewis that she was going to kick the door down. Lewis told Quinn not to come into the bedroom and to mind her own business or he would "shoot at" her.[2] Quinn eventually calmed down Lewis and then left the house to get her daughter. When she returned later that day, Lewis was out of the bedroom.

*Assault on Amanda Quinn (count 5)*

After Lewis and Goffredo moved into the house that Quinn rented, they frequently argued and fought. One of their roommates, Kayla Sudeta, testified that she witnessed an argument between Lewis and Goffredo during which Lewis pointed a gun at Goffredo and told her that "she needed to tell [someone] that they weren't together or he was going to shoot her." On another occasion, Sudeta heard Lewis slap Goffredo while they were arguing in the hallway. Goffredo ran out of the hallway and said that Lewis was a woman beater and she was going to call the police. Sudeta asked Goffredo not to call the police because she "thought [she (Sudeta)] had a warrant" and would go to jail if the police came.

Quinn was worried about Lewis's possession of guns because of the fighting between him and Goffredo and because there were children in the house. There were

---

[2] On redirect examination, Quinn said that she heard Lewis say, "Get away from the door," but did not hear him say, "or I'll shoot," because she had walked away from the door.

also drugs in the house, and she was afraid that the police were going to come. She testified that everyone who lived at the house, including her, used methamphetamine and that she moved out of the house in February 2010 because "nobody was getting along in the house because of the drugs, and I couldn't take it anymore."

On the weekend of January 23, 2010, there was a party for Goffredo's 21st birthday at the house. During the party, Lewis and Goffredo went into their bedroom and got into an argument. Sudeta, Quinn, and other people attending the party gathered outside the bedroom door and Quinn knocked on the door. From inside the bedroom Lewis said, "Get away from the door or I'll shoot." A shot was then fired through the door but no one was hit. Sudeta testified that she, Quinn, and another party guest were standing by the door when the shot was fired.

*First and second degree murder (counts 1 and 2)*

Lewis's friend, Matthew Blaylock, testified that at the time Goffredo was shot and killed, he was in a trailer, which he called his "shop," in the backyard of the Smith Road residence. That morning, he and Lewis had gone together to a McDonalds and an auto parts store. When they returned to the residence, Blaylock went to the shop to read an installation guide for an oil pressure gauge and Lewis went into the house. Within an hour, Lewis entered the shop and told Blaylock that he had accidentally shot Goffredo. Blaylock ran into the house and Lewis followed him. Blaylock stepped into the doorway of Lewis and Goffredo's bedroom and saw Goffredo lying on the bed. He immediately turned around and went back outside and Lewis followed him. After the two men talked

5

"for a brief second," Lewis called 911 and reported that he had shot his girlfriend in the face. Blaylock estimated that about two and a half minutes passed from the time Lewis came into the shop to tell him about the shooting and the time Lewis called 911.

Police and paramedics from the fire department arrived at the scene and found Goffredo lying on her back in a pool of blood on the floor of her bedroom. She was pronounced dead at the scene. A handgun was on the floor next to her body, and there was a bullet in her hair at the point of the exit wound. Bloodstains on the bed and floor showed that Goffredo was lying on the bed when she was shot and was then moved to the floor.

In the bedroom, investigating officers found a fired cartridge case from a .357 magnum, a gun cleaning kit, and two unfired cartridges, one of which was a .357 magnum cartridge. They also found a book about pregnancy and a book about parenting, entitled, respectively, "What to Expect When You're Expecting" and "What to Expect the First Year." There was a hole in the bedroom door that had been patched on the outside of the door.

The medical examiner who performed Goffredo's autopsy testified that the cause of death was a gunshot wound to the head. The bullet entered Goffredo's body on the left side of the nose just below the left eye and exited the back of the head. There was a pattern of gunpowder stippling just below the left eye, extending to the left ear, and on

6

the left hand.[3]  Based on the density of the stippling pattern on Goffredo's face, and the stippling on her left hand, the medical examiner thought that the gun was nine to 12 inches from Goffredo's face when it was fired, and that her left hand was up near her left jaw.  The examiner determined that Goffredo was 10 to 12 weeks pregnant at the time of the shooting and that her death caused the death of the fetus.

*Police interviews*

Lewis was extensively interviewed by the police on the day of the incident and the following day.  He initially told the police that the shooting happened while he was cleaning his gun, which he thought was unloaded.  He said that the gun accidentally fired as he pulled a brush away from the hammer.  He noticed that Goffredo was bleeding and immediately called 911.  At the direction of the 911 dispatcher, he moved Goffredo from the bed to the floor and performed CPR on her until the paramedics arrived.

In a second interview, officers told Lewis that according to other people at the house, there had been more conflict between him and Goffredo than he had represented. The officers were told that Lewis had previously pointed a gun at Goffredo and "dry fired" the gun—i.e., fired it when it was unloaded.  Lewis denied that he had ever threatened Goffredo or anybody else with a gun, and said that he did not recall ever having dry fired the gun.  He changed his explanation of how he had accidentally shot Goffredo, saying that he pulled the hammer back and was not paying attention to where

---

[3]     The medical examiner explained that a stippling pattern is "caused by tiny abrasions caused by unburned particles of gun powder that come out of the barrel of the gun."

7

he was "swinging [the gun]." He later said that he and Goffredo were talking about a new apartment they were going to rent and thefts that had occurred at the apartment complex. He told Goffredo that was why he got the gun and then pulled the gun's hammer back. He began "playing" with the gun by twirling it "forward and backwards and like pulling the hammer back and . . . guiding it slowly back into place and then it goes off." He again told the officers that he thought the gun was unloaded at the time. When a detective asked him if he was facing Goffredo when he was twirling the gun, he said that "to [his] knowledge [he] was facing the TV area."

During a third police interview, Lewis said that he and Goffredo had a minor argument about "not taking care of what we were supposed to take care of." According to Lewis, the argument had been about getting her car from her parents. Lewis told her that he was going to "go do it" and was "taking care of what we need to take care of. . . ." He asked Goffredo if she was "fucking gonna handle what [she] needed to and . . . she said no . . . ." He then pulled the gun hammer back and the gun fired. He said that he had the gun in his hand "to show authority" and that "I guess you can call it intimidation . . . ." He wanted to say, "Hey, I'm handling my part[,] like why don't you handle yours?" However, he thought that the gun went off before he was able to tell her that. He did not remember pulling the trigger. He said that he did not have the gun "out [of] aggression like that. I had it there so we could have a civilized conversation . . . ." He pulled the hammer back because he "was playing with it like I said, just pulling it back, shift forward, talking to her, trying to work something out."

8

When a detective asked why he had changed his story, Lewis said, "[T]here's really no way . . . to explain it really, like the truth is the truth but it's still like so farfetched and unbelievable due to just the way it happened." He said that he did not intentionally pull the trigger and did not know the gun was loaded. Later in the interview, Lewis told the detectives for the first time that Goffredo was pregnant and that "that's one of the things that she was gonna go take care of. Like she's supposed to go down and get proof of pregnancy so she can get on Medi-Cal and get [an] abortion."

During his fourth police interview, on the day after the incident, Lewis reiterated that he and Goffredo had been talking about "taking care of what we needed to be taking care of and that's when . . . I went to intimidate her with the firearm and it went off in my hand." Lewis thought the gun was unloaded and said that he was just trying to scare Goffredo with it when he accidentally squeezed the trigger. Lewis maintained that they were not having an argument; rather, they were civilly discussing her wanting him to go get her car and his wanting her to go to Planned Parenthood to get proof of pregnancy. The issue of Goffredo going to Planned Parenthood had been "an ongoing thing" for a period of two weeks to a month, and Lewis agreed with the detective's statement that "there's only a certain amount of time . . . you can deal with that."

Lewis admitted that he had pointed the gun at Goffredo in the past, but said that he did not remember whether he had done so out of anger or for intimidation. He thought it was "[p]robably just a joke," and that he may have done it to get her out of his way if he was trying to leave and she would not let him. On the morning of the shooting, Lewis

9

told Goffredo that he would find her a ride to Planned Parenthood, and Goffredo "kept complaining."  Lewis ignored her and fidgeted with the gun by repeatedly pulling the hammer back and then easing it forward by squeezing the trigger with his thumb on the hammer.  The gun fired because he either squeezed the trigger too soon before he had his thumb on the hammer, or his thumb slipped off the hammer.

After a break, the police conducted their fifth and final interview with Lewis.  Lewis told the detectives that he knew the gun was loaded when he was pulling back and releasing the hammer just before he shot Goffredo because he had loaded it with six rounds before he went back into the house after working on the gun in the shop.  After he shot Goffredo, he took the remaining rounds out of the gun and threw them on the ground in the backyard while he was waiting for his 911 call to be answered.

*Defense*

Callie Olson testified for the defense.  She had dated Lewis for about a year and a half approximately three years prior to the trial, and they currently were "really good friends."  During their relationship, they rarely argued and he had never been violent toward her.

### III.

### DISCUSSION

A.    *Sufficiency of the Evidence to Support the First Degree Murder Conviction*

Lewis contends that his conviction of first degree murder must be reversed because the prosecution presented insufficient evidence to support findings that he shot

10

Goffredo with the intent to kill her and that he acted willfully, deliberately, and with premeditation. The definition of first degree murder includes "any . . . willful, deliberate, and premeditated killing . . . ." (§ 189.) The word "willful" means intentional. (*People v. Perez* (1992) 2 Cal.4th 1117, 1123 (*Perez*).) However, "[a] verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

The California Supreme Court has "identified three categories of evidence relevant to determining premeditation and deliberation: (1) events before the murder that indicate planning; (2) a motive to kill; and (3) a manner of killing that reflects a preconceived design to kill." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663, citing *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) The Supreme Court has repeatedly pointed out that these guidelines are descriptive rather than normative. (*People v. Gonzalez, supra,* at p. 663.) "They are not all required [citation], nor are they exclusive in describing evidence that will support a finding of premeditation and deliberation." (*Ibid.*)

"Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and

11

all logical inferences from that evidence in light of the legal definition of premeditation and deliberation . . . . Settled principles of appellate review require us to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt. [Citations.] The standard of review is the same in cases such as this where the People rely primarily on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*Perez, supra,* 2 Cal.4th at p. 1124.)

Viewing the evidence in the light most favorable to the judgment, we conclude that substantial evidence supports Lewis's first degree murder conviction. The jury could reasonably have inferred that Lewis intended to kill Goffredo from the fact that he shot her in the face at nearly point blank range. (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945 [shooting at point blank range "undoubtedly creates a strong inference that the killing was intentional"]; *People v. Lee* (1987) 43 Cal.3d 666, 679 [15 to 20 feet is near point blank range]; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 [for purposes of

12

attempted murder, "[t]he act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill' "].)

The jury could also reasonably have inferred that the killing was premeditated and deliberate based on evidence of events that occurred before the shooting and the manner of the shooting. After Lewis initially and repeatedly told the police that he thought the gun was unloaded when he shot Goffredo, he ultimately admitted that he loaded the gun with six rounds of ammunition after working on it in the shop just before he entered the house on the morning of the shooting, and that he knew the gun was loaded when he was pulling back the hammer and releasing it just before he shot Goffredo. The jury could reasonably have viewed Lewis's loading the gun and then taking it in the bedroom, together with his statement to the police that he "went to intimidate her with the firearm," as evidence of planning. The manner of killing—i.e., shooting Goffredo in the face at a very close range—also supports a reasonable inference that the killing was deliberate. (*People v. Koontz, supra,* 27 Cal.4th at p. 1082 [firing a shot at a vital area of the body at close range indicates a *deliberate* intent to kill].)

The jury's finding that Lewis premeditated the murder is further supported by evidence of motive. Lewis made statements to the police from which the jury could reasonably have inferred that he was upset with Goffredo because she intended to give birth to their child instead of aborting the pregnancy, as evidenced by the books about pregnancy and first-year parenting that were found in the bedroom where Lewis shot her.

13

Lewis told the police that he wanted Goffredo to go to Planned Parenthood to obtain proof of pregnancy "so she [could] get on Medi-Cal and get [an] abortion," and that the issue of her going there had been "an ongoing thing" between them for two weeks to a month. On the morning of the shooting, he told her that he would find her a ride to Planned Parenthood. He said that he had "gotten her many rides before, but she wasn't comfortable with the people . . . so she wouldn't take 'em." Goffredo was nearly three months pregnant, and Lewis expressed concern about the limited amount of time remaining to "deal with that." Lewis also told the police that just before the gun fired, he asked Goffredo whether she was "fucking gonna handle what [she] needed to and . . . she said no . . . ." He said that he had the gun in his hand "to show authority" and that "I guess you can call it intimidation . . . ." He said that just before he shot her, he intended to tell her, "Hey, I'm handling my part[,] like why don't you handle yours?" The jury could reasonably have inferred that Lewis killed Goffredo because she refused to get an abortion. The evidence of motive together with the evidence that Lewis shot Goffredo at nearly point blank range with a gun that he admittedly knew was loaded sufficiently supports the jury's finding that Lewis murdered Goffredo with premeditation and deliberation.

B.      *Jury Instructions on Express and Implied Malice*

Lewis contends that the court committed prejudicial error by instructing the jury with a version of CALCRIM No. 520 that did not correctly define the types of malice required for first and second degree murder. We independently review whether jury

14

instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

"Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' (*People v. Partlow* (1978) 84 Cal.App.3d 540, 558.) ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation. ' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

The trial court instructed the jury with CALCRIM No. 520 as follows:

"The defendant is charged in Counts 1 and 2 with murder in violation of Penal Code Section 187.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant committed an act that caused the death of another person or a fetus; AND

"2. When the defendant acted, he had a state of mind called malice aforethought; AND

"3. he killed without lawful excuse.

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with express malice if he unlawfully intended to kill.

15

"The defendant acted with implied malice if:

"1.  He intentionally committed an act;

"2.  The natural, probable consequences of the act were dangerous to human life;

"3.  At the time he acted, he knew his act was dangerous to human life; AND

"4.  He deliberately acted with conscious disregard for human or fetal life.

"Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time.

"It is not necessary that the defendant be aware of the existence of a fetus to be guilty of murdering that fetus.

"A fetus is an unborn human being that has progressed beyond the embryonic stage after major structures have been outlined, which occurs at seven to eight weeks of development.

"An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether the consequence is natural and probable, consider all of the circumstances established by the evidence.

"If you decide that the defendant committed murder, you must then decide whether it is murder of the first or second degree."

The court next instructed the jury with CALCRIM No. 521 as follows:

16

"The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused that death.

"The length of time a person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of reflection not the length of time.

"The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520 . . . .

"The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder, rather than a lesser crime. If the People have not met this burden, you must find the defendant is not guilty of first degree murder." (Italics added.)

Lewis contends that because CALCRIM No. 520 informed the jury that there are two kinds of malice, express and implied, and instructed them that "[p]roof of either is sufficient to establish the state of mind required for murder," it incorrectly conveyed the message that express malice is not a necessary element of first degree murder, and that even if the jury found that he did not act with *express* malice, it could still convict him of first degree murder based on a finding that he acted with *implied* malice. Lewis complains that neither instruction explained under what circumstances the jury could find him guilty of second degree murder. Lewis focuses only on CALCRIM No. 520 in

17

contending that the instructions failed to properly inform the jury concerning the types of malice required for first and second degree murder. We conclude that when considered together, the versions of CALCRIM Nos. 520 and 521 given in this case clearly differentiated between first and second degree murder, properly instructed the jury on both offenses, and did not suggest that the jury could convict Lewis of first degree murder based on a finding of implied malice.

CALCRIM No. 520 instructed the jury that if it decided that Lewis committed murder, it was required to decide whether the murder was of the first or second degree. CALCRIM No. 521 instructed the jury that to find Lewis guilty of first degree murder, it had to find beyond a reasonable doubt that he killed Goffredo willfully, deliberately and with premeditation—i.e., that he intended to kill Goffredo, carefully weighed the considerations for and against choosing to kill her, and knowing the consequences, made the decision to kill her before he shot her. CALCRIM No. 521 further instructed the jury that "[t]he requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520." By referring the jury to CALCRIM No. 520 to decide whether the killing met the requirements of second degree murder, CALCRIM No. 521 plainly instructed the jury that if it found that the killing was not deliberate and premeditated and, therefore, not first degree murder, it was to decide whether the killing was second degree murder based on either express or implied malice as explained in CALCRIM No. 520.

18

Thus, CALCRIM Nos. 520 and 521 together instructed the jury that if it found Lewis not guilty of first degree murder, it could find him guilty of second degree murder if it found that he either "unlawfully intended to kill" Goffredo but did so without premeditation and deliberation, or that he intentionally committed an act that he knew was dangerous to human life, and deliberately acted with conscious disregard for human life. The instructions together adequately explained the difference between first and second degree murder and under what circumstances the jury could find Lewis guilty of second degree murder. Considering CALCRIM No. 521's clear and unambiguous directive that the jury could convict Lewis of first degree murder only if it found beyond a reasonable doubt that he intended to kill Goffredo, carefully weighed the considerations for and against choosing to kill her, and knowing the consequences, made the decision to kill her before he shot her, we reject Lewis's contention that the instructions erroneously suggested that the jury could convict him of first degree murder based on a finding of implied malice.

C.      *Sufficiency of the Evidence to Support the Conviction of Assault with a Firearm on Count 3*

Lewis challenges the sufficiency of the evidence to support his conviction of assault with a firearm against Goffredo in December 2009, before he and Goffredo moved into the house on Smith Road. "To determine whether there is substantial evidence to support a conviction we must view the record in a light most favorable to conviction, resolving all conflicts in the evidence and drawing all reasonable inferences

19

in support of conviction. We may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant to be guilty on the theory presented." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528-529, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

" 'An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' (§ 240.) Assault requires the willful commission of an act that by its nature will probably and directly result in injury to another (i.e., a battery), and with knowledge of the facts sufficient to establish that the act by its nature will probably and directly result in such injury." (*People v. Miceli* (2002) 104 Cal.App.4th 256, 269.) "To point a loaded gun in a threatening manner at another (especially if accompanied by threats to shoot . . . ) constitutes an assault, because one who does so has the present ability to inflict a violent injury on the other and the act by its nature will probably and directly result in such injury." (*Ibid.*; *People v. Escobar* (1992) 11 Cal.App.4th 502, 505 [evidence that victim was aware defendant was holding a gun concealed inside a leather purse and heard the gun being cocked was sufficient to support conviction of assault with a firearm].)

We conclude that substantial evidence supports Lewis's assault conviction on count 3. Viewed in the light most favorable to the judgment, the evidence established that on the day of the assault, Lewis's friend Quinn entered Lewis and Goffredo's house, stood outside their closed bedroom door, and heard them arguing inside the bedroom.

Quinn heard Goffredo say, "Don't point that gun at me." Quinn then heard the sound of a gun being cocked. She told Lewis that she was going to kick the door down, and Lewis responded by telling her not to come into the bedroom and to mind her own business or he would shoot at her. The jury could reasonably infer from Lewis's threat to shoot at Quinn that the gun that Quinn heard being cocked was loaded. After Lewis killed Goffredo, he admitted to the police that he had previously pointed a gun at her and told her to get out of his way when she would not let him leave. Based on this evidence, the jury could reasonably find that Lewis committed an assault with a firearm against Goffredo by pointing a loaded gun at her in a threatening manner. (*People v. Miceli, supra,* 104 Cal.App.4th at p. 269.)

D.    *Custody Credits*

Lewis contends, and the People concede, that the sentencing minute order and abstract of judgment in this case incorrectly state that his credit for time served of 1,008 days includes conduct credit of 127 days. At the sentencing hearing, the court awarded 1,008 days of credit for days served and did not award any conduct credit. Accordingly, we direct the court to correct the sentencing minute order and abstract of judgment to reflect the court's award of presentence custody credit.

21

DISPOSITION

The trial court is directed to correct the December 7, 2012 sentencing minute order and the abstract of judgment to reflect the court's oral pronouncement at the sentencing hearing awarding Lewis 1,008 days of presentence custody credit and no conduct credit. In all other respects the judgment is affirmed.

                                                                               AARON, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.